IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ROBERT W. AVERY                                                    PLAINTIFF

      v.                              Civil No. 16-5169

SHERIFF HELDER, Washington County,
Arkansas; MAJOR RANDALL DENZER;
SERGEANT FULLER; SERGEANT MORSE;
SERGEANT ARNOLD; ARAMARK CORRECTIONAL
SERVICES, LLC; CHIEF MIKE PETERS, Springdale Police
Department; PATROLMAN VENCE MOTSINGER;
DEPUTY BRAD MORGAN; CORPORAL MULVANEY;
NURSE LANDON HARRIS; SERGEANT STANTON;
KARAS MEDICAL SERVICE; SERGEANT AKE;
LIEUTENANT FOSTER; REGINA WALKER;
LIEUTENANT REESER; and DR. KARAS                     DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights case filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis*.

Plaintiff is currently incarcerated in the Arkansas Department of Correction (ADC), Delta

Regional Unit.  The facts at issue in this case occurred after Plaintiff's arrest on May 23, 2016,

and during his subsequent incarceration in the Washington County Detention Center (WCDC).

Plaintiff contends his constitutional rights were violated in a multitude of ways.

The following summary judgment motions have been filed:

● a motion (Doc. 81 at 1-4) by Plaintiff against Deputy Brad Morgan;[1]

● a motion (Doc. 81 at 5-9) by Plaintiff against Patrolman Vence Motsinger;

---

[1] Plaintiff's motions do not adhere to the requirements of Rule 56 of the Federal Rules of Civil Procedure or Rules 7.2 and 56.1 of Local Rules for the Eastern and Western Districts of Arkansas.

● a motion (Doc. 86)  by the Plaintiff against Aramark Correctional Services and the County Defendants;[2]

● a motion (Docs. 84 & 92) by Plaintiff against the Washington County Detention Center Defendants, Sheriff Helder, Major Randall Denzer, Sergeant Morse, Sergeant Arnold, Deputy Brad Morgan, Sergeant Stanton, Sergeant Ake, Lieutenant Foster, and Lieutenant Reeser (the County Defendants);[3]

● a counter-motion (Doc. 94) filed by Deputy Brad Morgan;

● a motion (Docs. 112 & 151) filed by Aramark Correctional Services, LLC;

● a motion (Doc. 128) by the Medical Defendants, Dr. Karas, Karas Medical Service, Nurse Landon Harris, and Nurse Regina Walker;

● a motion (Doc. 131) by the County Defendants; and

● a motion (Doc. 132) by Chief Mike Peters and Patrolman Vince Motsinger of the Springdale Police Department (the City Defendants).[4]

A hearing was held on March 30, 2017, to allow the Plaintiff to respond orally to the motions filed by the Defendants.  Plaintiff appeared by video from the ADC.  The motions are ready for decision.

---

[2]Document 86 was docketed as a supplement to his statement of facts in support of his motions for summary judgment against Deputy Brad Morgan and Patrolman Vence Motsinger.  However, it is clear the claims addressed are those dealing with the commissary charges and the contract between Aramark Correctional Services and Washington County.

[3]Document 84 was docketed as a statement of facts in support of his summary judgment motions against Deputy Brad Morgan and Patrolman Vence Motsinger.  However, it is clear that the claims addressed are the lack of a law library and the limitation on the number of sheets of paper and envelopes provided.  Document 92 was similarly docketed but it is clear it deals with conditions of confinement at the WCDC.

[4]As so many summary judgment motions are at issue, the Court will refer to exhibits by CM/ECF document and page number rather than the designation used by the movants and respondents.

**1.  Applicable Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." <u>National Bank of Commerce v. Dow Chemical Co.</u>, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." <u>National Bank</u>, 165 F.3d at 607 (<u>citing Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." <u>Id.</u> (citing, <u>Metge v. Baehler</u>, 762 F.2d 621, 625 (8th Cir. 1985)).

**2.  Discussion**

This case stems from the Plaintiff's arrest on May 23, 2016, and his subsequent incarceration at the WCDC.  Plaintiff asserts the following claims: (1)(a) Aramark Correctional Services, the contract food service provider for the WCDC, served substandard food that was protein deficient, nutritionally unbalanced, and contained inadequate portion sizes especially on days that commissary was ordered; (b) prices charged for commissary items constituted extortion and price gouging; and (c) the handling and serving of the food was unsanitary and the food was

-3-

not kept at proper temperatures; (2)(a) there was no law library; and (b) he was given insufficient writing paper and refused additional sheets; (3) transport vans are steel boxes with no seat belts and inmates are in shackles and belly chains and are thrown into the metal sides; (4)(a) he was denied newspapers and magazines; (b) he was denied meaningful access to news media--the radio is played but it cannot be heard over the intercom system; (5) he was subjected to an unsafe environment--he was locked inside a cell behind two steel doors without an intercom or other way to alert or notify staff in case of a medical or security emergency and he was locked out of his cell at times with no access to his bunk or his personal property; (6) staff fail to deliver the mail promptly and don't deliver it at all on Saturdays; (7) thirty-two detainees are forced to use one toilet that also provides drinking water; (8) there is a risk of slip and fall because there is no caution paint or non-slip surface on the steps and the showers spray water on the floor and walkway; (9) visitation is done over television screens which are viewable by the entire barracks including inmates in the shower; (10) the grievance procedure is flawed and subject to manipulation--(a) specifically only 3 or 4 requests or grievances may be open at a time--plaintiff slipped and fell but could not put in a medical request for several days because the defendants would not close out grievances; and (b) the kiosk results in privacy violations and theft or money and phone time; (11)(a) Springdale Patrolman Vence Motsinger placed leg irons that were too small on Plaintiff's ankles causing undue pain; (b) on another occasion Deputy Brad Morgan put leg irons on Plaintiff that were too small causing undue pain; and (13) medical staff do nothing to treat inmates as they go through detoxification (detox) from methamphetamine and opioid addictions.  Plaintiff also purports to assert a claim under the Arkansas Deceptive Trade Practices Act based on the commissary sales.

At the hearing, Plaintiff orally withdrew the following claims: (1) his claims against Nurse Landon Harris and Nurse Regina Walker; (2) his claim that he was entitled to a vegetarian

-4-

diet; (3) his claim about the handling of the food by Aramark Correctional Services; (4) his claim about inadequacies in the grievance procedure; (5) his claims against Sergeant Arnold; and (6) his claims Lieutenant Reeser.  These claims and Defendants should be dismissed.

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. West v. Atkins, 487 U.S. 42 (1988); Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. Daniels v. Williams, 474 U.S. 327 (1986); Davidson v. Cannon, 474 U.S. 344 (1986).

### A.  The City Defendants

### (1).  Background

With respect to the City of Springdale, Plaintiff testified that the transport vans have no safety belts or other restraints.  During transport, Plaintiff testified inmates were thrown around causing bruising and swelling from being "slammed into metal."  Plaintiff indicated he had been transported on May 23, 2016, and several other times in the SPD vans.  He described the back of the van where the prisoners rode as a steel box within a box.  *See* Doc. 115-1 at 53.  Specifically, during his deposition, he described the van as:

> a steel cage with a slot in the center.  You put three people in here.  It's all metal enclosed.  Put a latch down, you put a padlock.  You lock the person in.  You shut the other door, you lock that door.  You're inside this steel cage, inside of a steel van, inside of a double set of locked doors.  There's no cushion, no nothing.  All the exposed hard, sharp metal, you're handcuffed like this (indicating).  No way to be seatbelted down.

AO72A
(Rev. 8/82)

Doc. 115-1 at 31; Doc. 149 at 3-4 & 7-11 (pictures of the inside of the transport van).  Plaintiff testified you were transported in belly chains and leg irons.  Doc. 115-1 at 53-54.  He indicated there were no windows but there was a light that sometimes was turned on.  *Id.* at 55.

On May 23, 2016, Plaintiff was transported from Springdale to the WCDC.  Plaintiff estimated the distance to be approximately seventeen miles.[5]  Plaintiff suffers from Post Traumatic Stress Disorder (PTSD) and indicated he had an episode while being transported on May 23, 2016.  In Plaintiff's opinion, the vans should have seat belts and safety bars designed to keep the prisoners in their seats.  See e.g., Doc. 149 at 1-2 (pictures of the type of safety restraints that are available).

He was never in an accident while in a transport van and suffered no injuries on May 23, 2016, other than scratches and bruises.  Doc. 96-1 at 6-7.  There were no injuries he considered worth seeking medical care for.  *Id.*

With respect to Patrolman Vence Motsinger, Plaintiff testified that on May 23, 2016, Patrolman Motsinger put leg irons that were too small on Plaintiff's ankles.  Plaintiff was dressed in "free world" clothing--blue jeans, boots, and a t-shirt.  He testified that Patrolman Motsinger rolled the soft leather upper of the boots down, and put the leg irons on his ankles.  Plaintiff asked that larger leg irons be used.  Plaintiff advised Patrolman Motsinger that the leg irons were causing him pain and possible injury to his right ankle and leg.  His left leg was fine.  Doc. 115-1 at 56.  Plaintiff has submitted a sworn statement from another inmate in the van that day who indicate she believes Plaintiff was complaining of the leg irons being too tight.  Doc. 149 at 23.

Plaintiff testified he has chronic issues with his feet from poor circulation and nerve damage which cause "all the black and the bruising" on his ankles.  Doc. 96-1 at 3; Doc. 130-1

---

[5]On May 25, 2016, Plaintiff pled guilty to a parole violation.  Doc. 115-1 at 5-6; Doc. 136-2 at 10.  He was therefore in pretrial status on May 23, 2016.

-6-

at 34 (1/13/2014 noting varicose veins to right lower leg with engorgement). It also causes the area to be raw and inflamed. Doc. 96-1 at 5; *see also* Doc. 136-3 at 7 (12/11/15 noting a non-healing wound on his right lower leg). Plaintiff had a prescription for TED hose, or compression socks, for varicose veins, but did not have them on that day. Plaintiff testified the leg irons caused swelling and bruising on his already injured right leg. *See* Doc. 115-1 at 52-53. When he arrived at the WCDC, Plaintiff stated he had a "bruised ring around his leg." *Id.* at 56. Plaintiff does not contend his right leg was further injured but does contend that he was put in undue pain because of the tightness of the leg irons. Doc. 115-1 at 60. Plaintiff indicated he was in the restraints for over an hour. *Id.* Plaintiff testified he was given ice packs and naproxen at the WCDC. *Id.* After three or four hours, Plaintiff indicated that the blood flow returned and it felt better. *Id.* at 61.

By affidavit, Patrolman Motsinger states that he was involved in the Plaintiff's arrest on May 23, 2016. Doc. 106-1 at 1, ¶ 4; *see also* Doc. 133-1 at 1, ¶ 4 (a second copy of Vence Motsinger's affidavit). Later that day, the Plaintiff, Kiley Lawhorn, Bertha Walker, Twyla Corenelison, Cari Dougty, and Bryan Powell were transported by a SPD van to the WCDC. Doc. 106-1 at 2, ¶ 5. Officer Roger Eubanks was the driver of the van and Patrolman Motsinger was a passenger. *Id.* at ¶ 6. The trip took approximately twenty minutes. *Id.* at ¶ 7. Patrolman Motsinger states that he did not put leg irons on the Plaintiff or any of the other individuals being transported that day. *Id.* at ¶ 8. Patrolman Motsinger recalls the individuals being transported were restrained by belly chains not leg irons. *Id.* at ¶ 9.

If leg irons were used on inmates being transported, Patrolman Motsinger states the leg irons are put on by the jailers. Doc. 106-1 at ¶ 10. By affidavit, Jailers Austin Bowen and Jean

-7-

Rodriguez assert they were the jailers on duty on May 23, 2016, and to the best of their recollection Plaintiff was not placed in leg irons. Doc. 106-2 at 1, ¶¶ 3-5; Doc. 106-3 at 1, ¶¶ 3-5. The shift log does not indicate any of the inmates transported were placed in leg irons. Doc. 106-2 at 2, ¶ 6; Doc. 106-3 at 2, ¶ 6. Both jailers indicate inmates being transported are only put in leg irons if they are being combative. Doc. 106-2 at 2, ¶ 7; Doc. 106-3 at 2, ¶ 7. They indicate Plaintiff was being cooperative on May 23, 2016, and was put in belly chains. *Id.*

**(2). Discussion**

**Transport Vans--Official Capacity Claims**

The van used to transport Plaintiff was inspected by personnel of the Arkansas Criminal Facility Detention Standards who informed the SPD that the van met and exceeded their expectations for proper transport. Doc. 133-5 at 1, ¶¶ 2-4. Captain Hritz confirmed that the Plaintiff was transported in the van that was inspected. *Id.* at ¶ 4. The City Defendants have also provided pictures of the inside of the transport van. Doc. 133-6 at 1-2.

In Spencer v. Knapheide Truck Equipment Co., 183 F.3d 902 (8th Cir. 1999), Spencer was arrested for simple assault and he was handcuffed with his hands behind his back and put in the rear of a patrol wagon in the prisoner compartment. *Id.* at 904. He was intoxicated at the time. *Id.*

> There were no seatbelts or other safety restraint devices installed in the compartment. Spencer claims that during the trip to the police station, he had difficulty maintaining his balance on the bench and that he was tossed around as [the driver] made turns, stops, and starts. At some point during the ride, Spencer claims he was thrown forward into the bulkhead of the compartment causing severe injuries and rendering him a quadriplegic.

*Id.*

-8-

As in this case, the Plaintiff brought an official capacity claim. Spencer argued the Board of Commissioners "maintained an official policy of purchasing and using patrol wagons that were inherently unsafe;" a "policy of transporting intoxicated individuals with their hands cuffed behind their back in these patrol wagons, even after notice that such policy was resulting in injuries; and . . . these policies constituted a form of punishment for pretrial detainees." *Id.*

Regardless of whether the claims was analyzed under an objective or a subjective standard, the Eighth Circuit stated it "would still find that Spencer has failed to state a due process violation. . . . [W]e do not think that the Board's purchase of patrol wagons without safety restraints nor its manner of transporting individuals in these wagons were policies that obviously presented a 'substantial risk of harm.'" *Id.* at 906.

The reasoning in <u>Spencer</u> applies to this case. The City Defendants are entitled to summary judgment on this claim.

**Chief Peters--Individual Capacity Claim**

To the extent, Plaintiff intended to assert a personal capacity claim against Chief Peters, that claim fails. There is no suggestion in the record that Chief Peters was even aware of Plaintiff's transport or that he had any knowledge of a history of individuals being injured in the transport vans. Without some personal involvement, he cannot be held liable under § 1983. <u>See e.g., Mark v. Nix</u>, 983 F.2d 138, 139-40 (8th Cir. 1993) (section 1983 liability requires some personal involvement or responsibility). Chief Peters is entitled to summary judgment on this claim.

-9-

**Use of Leg Irons**

Construing the facts in the light most favorable to the Plaintiff, I will assume, despite significant evidence to the contrary, that Plaintiff was put in leg irons by Patrolman Motsinger. Plaintiff was a pretrial detainee when being transported to the WCDC.

The law is clear that a pretrial detainee cannot be punished. See e.g. Bell v. Wolfish, 441 U.S. 520, 535 (1979). "However, not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996); see also May v. Sheahan, 226 F.3d 876, 884 (7th Cir. 2000) ("The Due Process Clause of the Fourteenth Amendment prohibits the use of bodily restraints in a manner that served to punish a pre-trial detainee").

The Supreme Court held that a pretrial detainee need only show that an officer's use of force was objectively unreasonable to prevail on an excessive force claim. Kingsley v. Hendrickson, et al, ___ U.S. ____, 135 S. Ct. 2466, 2473 (2015). The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). The determination should be made:

> from the perspective of a reasonable officer on the scene. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

Id. (quoting Bell v. Wolfish, 441 U.S. 520, 540 (1979)). In determining whether a given use of force was reasonable or excessive, the Court said the following may bear on the issue:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the

-10-

threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id*. The Court noted that the list was not exclusive but instead only illustrated the "types of objective circumstances potentially relevant to a determination of excessive force." *Id*.

In connection with the use of restraints, the Eighth Circuit has, in cases involving the use of handcuffs, found the use of the restraints for their intended purpose, without additional factors, does not amount to excessive force unless some long-term or permanent injury resulted. For example, in Crumley v. City of St. Paul, 324 F.3d 1003, 1008 (8th Cir. 2003), the court concluded no reasonable jury could have found excessive force in applying handcuffs because the plaintiff failed to present any medical records indicating a long-term or permanent physical injury. See also Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1077-78, 1082(8th Cir. 1990)(without medical records indicating arrestee suffered long-term injury, allegations of pain and nerve damage as a result of being handcuffed too tightly for two hours were insufficient to support excessive force claim). "For the application of handcuffs to amount to excessive force, there must be something beyond minor injuries." Hanig v. Lee, 415 F.3d 822, 834 (8th Cir. 2005); see also Wertis v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006)("[B]ecause some force was reasonably required to arrest and handcuff [the plaintiff], his relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition were de minimis injuries that support the conclusion that [the defendant] did not use excessive force").

Restraints quite naturally are meant to confine and reduce movement. Whether handcuffs or leg irons, common sense suggests the restraints will leave some evidence of their use such as marks, bruising, swelling, scrapes or other minor injuries. See e.g., Chambers v. Pennycock, 641

-11-

F.3d 898, 907 (8th Cir. 2011)("Handcuffing inevitably involves some use of force . . . and it almost inevitably will result in some irritation, minor injury, or discomfort where the handcuffs are applied").  Viewing the evidence in the light most favorable to the Plaintiff, I do not believe there is a genuine issue of material fact as to whether the amount of force used was objectively unreasonable.  Plaintiff was in the restraints only long enough to transport him approximately seventeen miles to the WCDC.  Plaintiff testified that he suffered pain but that the restraints did not cause the condition of his right ankle to worsen.  He testified the problems with an open wound on his right leg began before 2016 and that his ankle looked the same in October of 2016 as it had prior to May 23, 2016.  Doc. 149-4 at 1-3 (pictures taken in October of 2016).  Further, he testified the marks left by the leg irons were gone within a few hours.  Patrolman Motsinger is entitled to summary judgment in his favor.

### Use of Leg Irons--Official Capacity Claim

To the extent Plaintiff asserts an official capacity claim based on the use of leg irons, the claim fails.  There is absolutely no evidence that the City of Springdale had a custom, policy, or practice of utilizing leg irons in such a way as to cause injury to detainees.  Certainly, there is nothing unconstitutional about the use of the leg irons when transporting inmates.

"Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." Bolcerson v. City of Wentzville, Missouri, 840 F.3d 982, 985 (8th Cir. 2016)(citation omitted).  There is no evidence in the summary judgment record that could support a conclusion that the City of Springdale is liable.  The City of Springdale is entitled to summary judgment on this claim.

AO72A
(Rev. 8/82)

### (B).  Medical Defendants

### (1).  Background

At the time of booking, Plaintiff reported chronic lower back problems, his right ankle being sprained, hypertension, and that he was borderline disabled.  Doc. 136-2 at 4.  Plaintiff testified that when he was booked in, he was full of alcohol, methamphetamine, and had also taken four or five hydrocodone.  Despite this, he told the booking officer he was not doing any drugs.  At no point did the Plaintiff report going through withdrawal.

However, at the hearing Plaintiff testified that from May 24th to May 31st, 2016, he was undergoing withdrawal.  Plaintiff states he was in the lock-out side of the WCDC which meant he was locked out of his cell during the day-time.  The pod he was in, if full, had thirty-two men in it.  He asserts he was left to lay on the bare concrete floor in the day-room while sweating, shaking, dizzy, and sick from withdrawal.  He asserts that no one was called about his condition.  Plaintiff also alleges the Medical Defendants had no protocol for the detoxification (detox) of inmates.

The Medical Defendants submitted as an exhibit their protocols for detox which include Alcohol Withdrawal, Benzodiazepine Withdrawal, Opioid Withdrawal, and Bath Salts Withdrawal.  Doc. 130-2 at 7-8.  The protocols include monitoring the inmate for ninety-six hours, sets forth medications that may or should be given, directs the checking of vital signs, and specifies when providers should be notified, etc.  *Id.*

After another inmate spit in Plaintiff's face on October 3, 2016, Plaintiff testified Dr. Karas ordered a Hepatitis C test.  *See* Doc. 130-1 at 7.  Dr. Karas entered a notation on October

-13-

12, 2016, that Plaintiff would be checked for Hepatitis C and HIV in three weeks as it took a minimum of three weeks to test positive.  *Id.*

Chart notes from October 18, 2016, made by Nurse Veronica Dockery indicate that the inmate involved in the altercation with the Plaintiff tested negative for HIV but positive for Hepatitis C.  Doc. 130-1 at 7.  She changed the lab draws for Hepatitis C to be scheduled for three to six months and noted that Plaintiff would be advised of the plan.  Doc. 130-1 at 6-7.  It is not clear why the lab tests were put off.[6]  *Id.*  Plaintiff testified he was not tested while at the WCDC.  However, when the three month time period was up, Plaintiff was no longer incarcerated at the WCDC.  Since he has been at the ADC, Plaintiff testified he has had blood drawn but he has not been tested for Hepatitis C.

**(2).  Discussion**

**Detox Claim--Exhaustion of Administrative Remedies**

First, Dr. Karas argues the Plaintiff filed no grievance regarding his claim that he was denied adequate medical care while going through withdrawal.  The Prison Litigation Reform Act (PLRA) in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

---

[6]I note, however, that the United States Department of Veterans Affairs provide the following with respect to the length of time it takes to test positive.  "If a person exposed to hepatitis C becomes infected, virus particles (called HCV RNA) can be detected within 1-2 weeks. Liver function tests also will tend to rise during this timeframe. Hepatitis C antibodies appear after RNA is detectable and can take 3-12 weeks to appear."
https://www.hepatitis.va.gov/patient/hcv/testing/time-required-to-test-positive.asp (accessed July 17, 2017).

Exhaustion is mandatory. <u>Porter v. Nussle</u>, 534 U.S. 516, 524-25 (2002). In <u>Jones v. Bock</u>, 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." <u>Id.</u> at 218 (internal quotation marks and citation omitted). The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." <u>Id.</u> "[F]ailure to exhaust available administrative remedies is an affirmative defense, not a matter of subject matter jurisdiction." <u>Lenz v. Wade</u>, 490 F.3d 991, 993 n. 2 (8th Cir. 2007).

Here, there is no evidence in the record suggesting the Plaintiff exhausted his administrative remedies with respect to the detox protocols. However, for purposes of providing a complete record for review, the parties' remaining arguments will be addressed.

**Detox Claim--Personal Knowledge or Involvement**

Second, Dr. Karas argues there is no evidence he was personally aware of Plaintiff's addiction and/or need for medical monitoring during his detox. Dr. Karas argues there is no evidence that a medical request was made by Plaintiff or that medical staff were informed by the County Defendants that Plaintiff was going through withdrawal or was otherwise ill during this period of time.

I agree. On his intake questionnaire, Plaintiff indicated he did not use amphetamines. Doc. 130-1 at 21. Plaintiff made no mention of his alleged withdrawal symptoms when he complained of a sprain to his right ankle on May 25, 2016, was seen by the nurse, and was given

-15-

an ice pack and naproxen for seven days. *Id.* at 19. Records indicate Plaintiff received the ice and naproxen. *Id.* at 29-30.

On May 25, 2016, Plaintiff also pled guilty to violation of his parole. The documents were signed by him his parole, and the revocation hearing judge on that day.

On May 26, 2016, Plaintiff was added to the doctor list because of a complaint of lower edema. Doc. 130-1 at 19. Plaintiff did not mention any withdrawal symptoms. On May 30, 2016, Plaintiff complained of various medical problems including hypertension and varicose veins but again did not mention any withdrawal symptoms. Doc. 136-3 at 24.

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007) (quoting Mayorga v. Missouri, 442 F.3d 1128, 1132 (8th Cir. 2006)); <u>Mark v. Nix</u>, 983 F.2d 138, 139-40 (8th Cir. 1993) (section 1983 liability requires some personal involvement or responsibility). Here, there is simply no suggestion that Dr. Karas was aware of Plaintiff's addiction, knew he was suffering from withdrawal, or had any knowledge that he was weak, having problems eating, vomiting, shaking, or shivering in the four or five days following his incarceration on May 23, 2016. Dr. Karas is entitled to summary judgment on the individual capacity claim.

**Detox Claim--Official Capacity Claim**

Because the policy is facially lawful and did not compel unconstitutional action, the Medical Defendants argue Plaintiff has the high burden of proving that their decision to maintain the policy was made with deliberate indifference to its known or obvious consequences. The

-16-

Medical Defendants argue there is no evidence that the policy was adopted with deliberate indifference to any known or obvious consequence.  I agree.

In <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), the Court held that a municipality could not be held liable simply because it employed the tortfeasor.  *Id.* at 691.  In other words, a *respondeat superior* theory of liability did not apply.  *Id.*  Instead, liability was dependent on official policy or action.  <u>Szabla v. City of Brooklyn Park, Minn.</u>, 486 F.3d 385, 389 (8th Cir. 2007)(citations omitted).

A Plaintiff "seeking to impose liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." <u>Board of County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 403 (1997).  "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." <u>Moyle v. Anderson</u>, 571 F.3d 814, 817-18 (8th Cir. 2009) (citation omitted); <u>Jenkins v. County of Hennepin</u>, 557 F.3d 628, 633 (8th Cir. 2009)(Plaintiff must point to "any officially accepted guiding principle or procedure that was constitutionally inadequate").

In this case, Plaintiff has not alleged the detox policy or any custom of the Medical Defendants was the moving force behind the alleged violations of his constitutional rights.  The Medical Defendants are entitled to summary judgment on any official capacity claims.

-17-

**HIV & Hepatitis C Screening--Delay in the Provision Of**

The Eighth Amendment's prohibition against cruel and unusual punishment establishes the "government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. Estelle v. Gamble, 429 U.S. 97, 103 (1976)(internal quotation marks and citation omitted). "For this reason, the Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners." Robinson v. Hager, 292 F.3d 560, 563 (8th Cir. 2002)(citing Estelle, 429 U.S. at 104).

In order to succeed on a denial of medical care claim, an inmate must show both that he had an objectively serious medical need and that the defendant was deliberately indifferent to that need. Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)(citations omitted). "A medical need is serious when it has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir. 2006)(citation omitted). "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation." Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)(citation omitted). "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir. 1992).

The Medical Defendants argue there is no verifying medical evidence that any delay in Plaintiff being tested for HIV or Hepatitis C affected Plaintiff's prognosis or his medical condition in anyway. The objective seriousness of delay in treatment must be measured by reference to the effect of delay, which must be shown by verifying medical evidence in the summary judgment record. Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005). There is no such evidence in the record. Additionally, Plaintiff has not pointed to any evidence of intentional delay. Fourte v. Faulkner County, Ark., 746 F.3d 384, 390 (8th Cir. 2014). The Medical Defendants are entitled to summary judgment on this claim.

### HIV and Hepatitis C Claim--Official Capacity Liability

Plaintiff has presented no evidence of the existence of a custom or policy that was the moving force behind this alleged constitutional violation. The Medical Defendants are entitled to summary judgment on this claim.

### (C). Aramark Correctional Services

### (1). Background

Plaintiff maintains the food was both nutritionally and calorically inadequate. He maintains he lost thirty-three pounds as a result of the nutritionally deficient food. He testified that Aramark routinely served substantially smaller food portions on the four days when commissary could be ordered. *See also* Doc. 115-1 at 20. Plaintiff maintains he went from 272 at booking in May of 2016 to 236 pounds in October of 2016. *See also* Doc. 115-1 at 18. Plaintiff's intake documents indicate his weight at booking was 269. Doc. 136-2 at 2 & 4. On August 24, 2016, his weight was recorded as 250 pounds. *Id.* at 45. On September 28, 2016, Plaintiff noted he had been weighed the day before and his weight was 236. *Id.* at 53. It was

-19-

noted that at this weight he was still considered overweight by his Body Mass Index (BMI). *Id.* at 54.

Plaintiff testified he lost muscle mass, suffered from hunger pains, and suffered mental anguish. Plaintiff testified he made several requests for additional portions or meals with more calories but was told by medical staff that according to his BMI he was healthy and did not need a supplemental diet. *See e.g.,* Doc. 115-2 at 8-10, 12-14; Doc. 136-4 at 25.

Prior to his incarceration, Plaintiff estimated he consumed between 3500 and 4000 calories a day. Doc. 115-1 at 18. He was using methamphetamine daily. *Id.* at 19. He worked out three or four times a week for thirty to forty-five minutes. *Id.* After his incarceration, he quit working out because he was hungry. *Id.* at 18. He stated he did continue to walk for about twenty minutes a day. *Id.* Plaintiff is 6'4" tall. *See e.g.,* Doc. 130-1 at 75.

Plaintiff indicated he ate all the beans and rice on his trays but would trade the meat for potatoes, or beans. Doc. 115-1 at 20. He would supplement this with ramen noodle soup he purchased at the commissary. *Id.*

It was noted that Plaintiff went from 300 pounds down to 269 pounds while at the ADC. Plaintiff conceded this. *See also* Doc. 130-1 at 36 (12/11/2015-note that Plaintiff weighed 300 pounds and was counseled to start a weight loss program); Doc. 136-3 at 7 (12/11/15-noting Plaintiff was morbidly obese). However, at the ADC, he testified that he did not suffer hunger pains and did not lose muscle mass when he lost this weight.

Plaintiff contends Aramark's goal was to increase commissary sales. He testified that inmates were forced to buy everything from Aramark including underwear, t-shirts, socks, and soap. Further, he stated that excessive prices are charged for commissary items. For example,

he indicated ramen noodle soup costs 89¢ rather than the 12¢ or 13¢ it costs in the grocery store. Similarly, stamped envelopes cost 69¢ rather than just 54¢. In Plaintiff's opinion, Aramark decreases the amount of food served to motivate inmates to spend more money on commissary. He asserts the WCDC gets a percentage of all commissary sales. Plaintiff testified he is not arguing that Aramark is not entitled to make a profit but that the rate of profit is too high.

Plaintiff asserts Aramark and the County Defendants have engaged in a civil conspiracy in order to generate profit and revenue. Plaintiff testified he believes Aramark violated the Arkansas Deceptive Trade Practices Act and that this equated to a constitutional violation.

With respect to the meals being served, Plaintiff testified the servings were not in keeping with those indicated on the twenty-eight day meal plan. In short, he contends Aramark is not serving what the menu indicates is being served. Plaintiff testified that he kept a handwritten menu to indicate what was actually served. Doc. 149-8 at 16. He testified he did not have a way to count the calories he was receiving but did list the food that was being served. *Id.*

During the relevant time period, Aramark was under contract to provide meals to inmates at the WCDC. Doc. 115-2 at 1, ¶ 2. Kate Crowley, a certified dietician, was responsible for the inmate menu at the WCDC. *Id.* at 1, ¶ 1. She asserts, by affidavit, that the inmate menu meets the guidelines established by the American Correctional Association and exceeds the current daily recommended intake for males and females aged 19-50 established by the Food and Nutrition Board of the National Academy of Sciences' Institute of Medicine. *Id.* at 2, ¶ 5.

A twenty-eight day meal plan is used. Doc. 115-2 at 3, ¶ 11. The meals are prepared in accordance with the plan to ensure consistency and adequacy of detainee diets. *Id.* Ms. Crowley indicates that the meals served average approximately 3000 calories per day and contain

-21-

adequate levels of protein, vitamin A, vitamin C, and calcium.  *Id.* at 2, ¶¶ 6 & 8.  She asserts

the meal plan is followed without regard to when commissary orders are placed or delivered.

*Id.* at 3, ¶ 12.  According to Ms. Crowley, Aramark is not permitted to serve any individual

detainee a special or therapeutic diet without an order from the medical department.  *Id.* at 3, ¶

13.

Carla Cink oversaw all food service operations at the WCDC.  Doc. 115-2 at 5, ¶ 1.  By

affidavit, she asserts that specific utensils are used to ensure that a full serving of each food item

is easily and precisely measured.  Doc. 115-2 at 2, ¶ 10.  For example, if ½ cup of coleslaw is

on the menu, it is served using a ½ cup spoodle.[7]  *Id.*  Ms. Cink asserts that all meals served

followed the twenty-eight day meal plan.  *Id.* at 6, ¶ 9.

**(2).  Discussion**

**Color of State Law**

Aramark re-asserts it's claim that it does not act under color of state law. This Court has

already rejected this argument and nothing new has been presented that would cause this court

to change its mind.  Doc. 141 (Opinion and Order on motion to dismiss).

**Profiteering, Price-gouging, and Monopoly**

No constitutional claim is stated by Plaintiff's allegation that he is charged more for items

purchased at the commissary than it would cost him to obtain the items in the free world.  Even

if Plaintiff is charged exorbitant amounts, no constitutional claim is stated.  See Register v.

Helder, et al., 2015 WL 6123071 (W.D. Ark. July 30, 2015);  Pagan v. Westchester County,

2014 WL 982876, *17 (S.D.N.Y. March 12, 2014)(even if Aramark engages in price gouging,

---

[7] A cross between a spoon and a ladle.

no constitutional claim is stated); <u>Montgomery v. Mancuso</u>, 2013 WL 4590436 (W.D. La. Aug. 23, 2013)("The law is clear that inmates have no constitutionally protected interest in purchasing goods through the prison commissary at the cheapest price possible"); <u>McKnight v. Taylor</u>, 2012 WL 5880331 (D.N.J. Nov. 20, 2012)("Prisoners have no federal constitutional right to purchase items from the jail commissary at any particular price, or to restrain the vendor from charging exorbitant prices").

Plaintiff's claim that the commissary is a monopoly fails to state a claim of constitutional dimension.  There is no constitutional right to access to a commissary.  <u>Tokar v. Armontrout</u>, 97 F.3d 1078, 1083 (8th Cir. 1996).  "Therefore, the fact that there is a single commissary operating without competition does not run afoul of the Constitution."  <u>Boyd v. Nowack</u>, 2010 WL 892995, *4 (E.D. La. March 11, 2010); <u>cf. McGuire v. Ameritech Services, Inc</u>., 253 F. Supp. 2d 998, 1007-08 (S.D. Ohio 2003)(state has absolute authority to regulate its prison system, and state's decision to utilize a monopolized collect calling system did not violate the Sherman Anti-Trust Act); <u>Countryman v. Access Securepak Keefe Commissary/Network, LLC</u>, 2012 WL 6962294, *2 (D. Nev. Nov. 2, 2012)("The State of Nevada, through NDOC, has not restrained trade or created an illegal monopoly by purchasing its commissary packaging supplies from a single company.  On the contrary, the State of Nevada has imposed restraints on commissary packaging supplies as an act of government which the Sherman Act did not undertake to prohibit").

**The Arkansas Deceptive Trade Practices Act**

In a novel argument for application of the Arkansas Deceptive Trade Practices Act (the Act), Ark. Code Ann. § 4-88-101 *et seq.*, Plaintiff maintains that Aramark engages in a deceptive

-23-

trade practice, by "[k]nowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of: (A) Physical Infirmity; (B) Ignorance; (C) Illiteracy; (D) Inability to understand the language of the agreement; or (E) A similar factor." Ark. Code Ann. § 4-88-107(a)(8)(A)-(E). Plaintiff contends prisoners are at a particular disadvantage and easily taken advantage of since they have no other means of obtaining these products.

Aramark asserts that it is unaware of any authority applying the Act to a claim by a detainee at a county detention center. Moreover, it notes the Act excepts actions or transactions that are governed by state agencies. Ark. Code Ann. § 4-88-101. Specifically, the Act exempts: "Actions or transactions permitted under laws administered by the Insurance Commissioner, the Securities Commissioner, the State Highway Commission, the Bank Commissioner, or other regulatory body or officer acting under statutory authority of this state or the United States, unless a director of these divisions specifically requests the Attorney General to implement the powers of this chapter." Ark. Code Ann. § 4-88-101(3).[8]   It asserts that its services at the WCDC are subject to the oversight of, and operates under laws administered by, the Criminal Detention Facilities Review Committee of the Arkansas Department of Finance and Administration.

Both issues, the application of the Act to prisoners and the possible application of the exemption, are questions not addressed by the Arkansas courts. Further, a survey of state courts, indicate that few, if any, courts have addressed these issues. For these reasons, the Court declines to exercise supplemental jurisdiction over this claim. 28 U.S.C. § 1367(c)(1) (court may

---

[8]This provision was amended on April 7, 2017, by 2017 Arkansas Laws Act 986 (H.B. 1742) to insert the word "specifically" in front of the word permitted.

-24-

decline to exercise supplemental jurisdiction over a claim that raises a novel or complex issue of State law).

### Adequacy of Diet

Aramark maintains that Plaintiff's claims concerning the adequacy of his diet are contradicted by his medical records and his own testimony.  Aramark asserts its meals are calorically and nutritionally adequate as demonstrated by its dietician certified twenty-eight day meal plan and the measures taken to ensure portion control.  Further, Aramark points out it is not responsible for the assignment of any special or medical diets.  It notes Plaintiff's medical records indicate that his weight exceeds a healthy weight.

Plaintiff testified he had no way of disputing that the twenty-eight day food plan contained the number of calories indicated on it.  Doc. 115-1 at 64.  He concedes he never went without a meal.  *Id.*  He also testified he traded food and thus did not eat the menu as set forth by, and certified by, the dietician.

The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health.  See e.g., Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996); Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992) (prisoners have a right to nutritionally adequate food); Campbell v. Cauthron, 623 F.2d 503, 508 (8th Cir. 1980) (prisoners are guaranteed a reasonably adequate diet).  "The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing."  LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993).

An Eighth Amendment claim has both an objective and subjective component.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  The objective component "tests whether, viewed

objectively, the deprivation of rights was sufficiently serious." Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008). The subjective component "requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.'" *Id.* (quoting Farmer, 511 U.S. at 834).

In claims involving allegations of an inadequate diet, the subjective component requires the Plaintiff to show that the Defendants were deliberately indifferent to his dietary needs. Wishon, 978 F.2d at 449. "Because control of the administrative details of a prison remains exclusively in the hands of prison officials, control of the diet is within their discretion, assuming it is adequate." Burgin v. Nix, 899 F.2d 733, 734 (8th Cir. 1990).

The records, viewed in the light most favorable to Plaintiff, show that Plaintiff's weight went from 269 in late May of 2016, to 236 in late September of 2016. A loss of 33 pounds over the course of approximately four months is significant. Clearly, the constitution would not permit the "incremental starvation" of inmates, George v. King, 837 F.2d 705, 707 (5th Cir. 1988); however, the loss of weight must be considered in context. As Aramark quite accurately points out, by reference to the BMI, Plaintiff was obese when he entered the WCDC and still overweight when he was released from there. See e.g., Whitney v. Morse, 2016 WL 908268 (W.D. Ark. Feb. 4, 2016)(loss of 23 pounds from March to October where Plaintiff still weighed more than recommended weight for his height insufficient where there is no evidence plaintiff became ill or suffered any other adverse physical effects or was denied a nutritionally and calorically adequate diet); Ahlers v. Kaskiw, 2014 WL 4184752, *9 (N.D.N.Y. Aug. 21, 2014)(loss of 66 pounds over more than four years--"plaintiff's gradual transformation from obesity to a healthy body weight clearly does not satisfy the objective prong of the deliberate indifference standard"); Evans v. Albany Cty. Corr. Facility, 2009 WL 1401645, *10 (N.D.N.Y.

-26-

May 14, 2009)(even assuming that plaintiff lost 30 pounds and experienced dizziness and headaches over a four-month period, the court concludes there is no evidence from which a reasonable trier of fact could find an Eighth Amendment violation).

Moreover, Plaintiff lost weight at a rate of just over two pounds per week.  According to the National Institute of Health (NIH), losing one to two "pounds per week is a reasonable and safe weight loss.[9]"  In attaining a healthy weight, the NIH indicates that "eating plans containing 1200 [to] 1600 calories each day are suitable for men.[10]"  The summary judgment record is insufficient to create a genuine issue of material fact as to whether the diet Plaintiff received was so inadequate that it violated the Eighth Amendment.  Aramark is entitled to summary judgment on this claim.

### (D).  The County Defendants

### (1).  Background

Plaintiff testified the WCDC did not have a law library.  *See also* Doc. 115-1 at 23-24. He indicated he suffered an actual injury because of it.  Specifically, he testified that he was harmed in the following ways:

(1).  *Avery v. Hyslip, et al.*, Civil No. 16-5283, was dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) as it was against public defenders who were immune from suit.  Plaintiff indicated he was unable to research how a public defender's immunity could be circumvented due to the lack of a law library.  The dismissal is currently on appeal to the Court of Appeals for the Eighth Circuit;

---

[9]https://www.nhlbi.nih.gov/health-pro/resources/heart/aim-facts-html (accessed June 6, 2017).  The Court takes judicial notice of the National Institute of Health's website.

[10]*Id.*

-27-

(2). Plaintiff also testified that he had a failure to protect claim based on when an inmate spit in his face dismissed.  Plaintiff did not provide a case number so the Court does not know at what point the case was dismissed or why it was dismissed;

(3). Plaintiff indicates he was undergoing a divorce and was unable to review family law in an attempt to protect his personal property.  However, Plaintiff testified he settled this matter. Doc. 149-7 at 1-4;

(4) paperwork was returned to him to properly prepare in a case where he was attempting to sue a private attorney; Doc. 147-7.  There is no indication Plaintiff suffered any actual injury with connection to this case.  The document merely indicates he had to complete an enclosed *in forma pauperis* application, send in a complaint, and complete the enclosed summons form.  *Id.*

(5) and an IFP form was denied because he did not have a set of court rules.  In the attached document, Doc. 149-7, the IFP was denied because the facts he alleged did not state a "colorable cause of action" in accordance with the Rule 72 of the Arkansas Rules of Civil Procedure.  *Id.*

The County Defendants admit there is no law library at the WCDC.  Instead, they assert detainees must obtain legal assistance through their attorneys, from others outside the facility, or obtain an order directing that they be transported to the Washington County Law Library which is located in the Washington County Courthouse.  *See also* Doc. 136-4 at 26-27.

Plaintiff maintains Sergeant Ake denied him paper to write a legal document on.  During his deposition, Plaintiff testified Sergeant Ake told him that he would not receive any paper other than that given out on Sundays and he could write his family or the courts.  Doc. 115-1 at 24.

-28-

As Plaintiff had no money in his commissary account on that occasion, he had to wait until Sunday for more paper. *Id.* at 25.

Plaintiff testified that on Sundays inmates were given seven sheets of paper and two envelopes.[11]  Plaintiff states inmates were forced to chose whether to write to family or correspond with the courts. While you could purchase paper, Plaintiff testified he did not always have money in his commissary account. Doc. 115-1 at 25.

Plaintiff testified he did not believe inmates were entitled to unlimited paper and envelopes but he did believe they should not be forced to chose between writing family and submitting documents to the Court. He stated he did not know the precise number of sheets of paper inmates were entitled to under the Constitution.

The County Defendants indicate that detainees are provided free of charge two prepaid envelopes and ten sheets of paper and must make their own choices as to the use of the materials. A detainee who has funds available may purchase envelopes and paper. If a detainee has no funds available, he may not purchase commissary items which include envelopes and paper.

Plaintiff also testified that Sergeant Ake interfered with the mail. With respect to Sergeant Morse, Plaintiff contends he refused to mail legal documents for Plaintiff and held a legal letter from Thursday to Sunday. By way of example, in his deposition, Plaintiff testified Sergeant Morse refused to mail letters to defense counsel.[12]  Doc. 115-1 at 13-14. Plaintiff

---

[11]In Document 84 at 1, Plaintiff indicates inmates are given ten sheets of paper. In his deposition, Plaintiff testified they were given eight sheets of paper. Doc. 115-1 at 24. The detainee handbook submitted as an exhibit indicates inmates are given "ten sheets of paper for correspondence of a personal nature." Doc. 136-5 at 44. It additionally provides that indigent inmates will be "provided with postage, envelopes, and paper for communication with the courts." *Id.*

[12]Plaintiff also testified Sergeant Morse acted in a rude, hateful, manner in accusing Plaintiff of being in a fight and threatened to file new charges against him. Doc. 115-1 at 14. Plaintiff was not charged or disciplined with respect to the fight. *Id.* at 15.

complained that Sergeant Morse returned legal letters to him marked "over two." Doc. 136-4 at 48 (9/14/2016). Plaintiff asserts that mail is not delivered to inmates on Saturdays. In his deposition, Plaintiff also testified that on two occasions certified mail sent to him by attorneys was opened in the front. Doc. 115-1 at 43.

The County Defendants indicate that mail in excess of the two free items is either returned to the detainee or held until the beginning of the next week to mail. The County Defendants state that the post office does not pick up or deliver mail at the detention center on Saturdays. Mail given to a deputy on Saturday therefore is not mailed until the following week. On at least one occasion, Plaintiff was provided with extra legal envelopes. Doc. 136-4 at 16-17 (date 6/5/2016).

Next, Plaintiff testified he was denied access to the news by means of newspapers and magazines. *See also* Doc. 115-1 at 34-35. The stated reason was the items could be used to cover up the light fixtures or windows, start fires, and clog up toilets. However, Plaintiff states other items such as books and religious pamphlets may also be used to plug up the toilets. He indicates Satellite radio is played but it is talk radio and has no local or state news. He also indicated it is sometimes difficult to hear the radio just because of the noise in the pod. Doc. 115-1 at 34; Doc. 136-4 at 23.

Plaintiff testified that he was exposed to the following dangers: the danger of slip and fall from wet floors caused by shower over spray, stairs without skid strips, hazardous stairs caused by a depression made when skid strips were removed; an open hole in the shower where a drain cover had been removed; thirty-two to thirty-six inmates being required to use a single stool

-30-

during lock-out periods from 9:00 a.m. to 2:00 p.m. and again from 4:00 p.m. to 6:30 p.m.;[13] exposure to contagious diseases by inmates spitting on other inmates; there being no intercoms in the cells leaving inmates unable to summon help during lock down from 8 p.m. until 5:00 a.m.; and overcrowding in the cells depending on the jail population.  While inmates were given opportunities to clean, Plaintiff testified no cleaning supplies were left in the barracks for periodic use during the day.

Plaintiff testified he injured his ankle in the shower drain and was given naproxen and an ice pack.  He also twisted his back when he slipped as a result of the shower over spray.  Doc. 115-1 at 45.  At some point, Plaintiff testified they began placing blankets on the floor to soak up the water from the over spray.

With respect to the visitation screens, Plaintiff testified there was a screen set up inside the barracks.  He indicated the visitor on the screen could be seen from the bathroom.  There was no privacy during visitation.

Various inmates made inappropriate remarks, gestures, and one inmate was caught masturbating.  Plaintiff testified that there were altercations between the inmates because of comments being made.  In fact, Plaintiff testified he was disrespectful on one occasion and received a black eye as a result.

Plaintiff also noted a disparity of living conditions between the A side and B side of the facility.  The B side had access to their bunks, television, were able to shave, the bathrooms were cleaner, and in general with the level of violence or risk of harm in the facility was less.

---

[13]Doc. 115-1 at 44.

When he came into the jail, Plaintiff testified he was addicted to opiates and methamphetamine. Doc. 115-1 at 47. When he was locked out of his cell, Plaintiff testified he just laid on the concrete floor because he could not sit at a table. *Id.* This lasted for four or five days. *Id.* at 48. Staff would get him up to eat, and then he would lay on the floor again. *Id.* He was vomiting, shaking, and shivering. *Id.* He testified he hallucinated and felt he was going to die. *Id.* He felt he should have been allowed to stay in his cell or something should have been done other than leaving him on the floor shaking and shivering. *Id.*

With respect to Sheriff Helder, Plaintiff testified he was personally involved in the commissary agreement with Aramark and with establishing the policies of the WCDC. During his deposition, Plaintiff testified he named Sheriff Helder as a defendant because he "holds the overall authority to dictate custom, practice, policy, and procedure." Doc. 115-1 at 9. Plaintiff also testified Sheriff Helder had the ultimate authority over grievances. *Id.* at 10. Plaintiff is asserting an individual capacity claim against Sheriff Helder because he created the policies and failed to intervene when Plaintiff's constitutional rights were being violated. Doc. 131-1 at 1.

Similarly, Plaintiff named Major Denzer as a defendant because he is the jail commander. Doc. 115-1 at 10. Plaintiff indicated he is asserting an individual capacity claim against Major Denzer because he is a creator of policy, failed to intervene when Sergeant Morse held Plaintiff's mail, and denied Plaintiff access to the courts. Doc. 131-1 at 1.

Plaintiff testified Lieutenant Foster, failed to intervene on his behalf, denied him access to the law library, denied him writing material, and instead of fixing any problems simply told Plaintiff to contact the Jail Standards Committee.

-32-

With respect to Sergeant Fuller, Plaintiff testified he became liable through his responses to multiple grievances.  Doc. 115-1 at 11.  Plaintiff indicated Sergeant Fuller answered every grievance negatively.  *Id.*  All communications with Sergeant Fuller occurred over the kiosk.  *Id.*

With respect to Deputy Brad Morgan, Plaintiff testified he transported Plaintiff from the ADC facility in Newport, Arkansas, to the WCDC on March 9, 2015.  Deputy Morgan used the small leg irons on the Plaintiff.   Plaintiff testified there are various sizes of leg irons and Deputy Morgan just had the small set.  It is county policy that leg irons are used when inmates are moved outside the detention center.  Doc. 136-4 at 28.

According to Plaintiff, Deputy Morgan told Plaintiff if he would allow him to put the small leg irons on he would remove them once they got to the patrol car and put a chain and padlock on Plaintiff instead.  However, once at the car, Deputy Morgan allegedly told Plaintiff to quit being a "puss."  During the transport, Plaintiff testified he made six to twelve additional requests for the leg irons to be removed.

According to Plaintiff, the small leg irons squeezed his ankles and caused him extreme pain for the four and one-half hour transport.  Plaintiff indicates his ankles were also wedged under the seat.  Once they arrived at the facility, Plaintiff testified Nurse Rhonda came out to see him.

Plaintiff testified his skin was raw, but not bleeding, from ulcers in his veins.  Nurse Rhonda provided him with TED hose and prescribed naproxen.  Doc. 96-3 at 3.  Plaintiff testified his right ankle still looked the same in October of 2016.

-33-

**(2). Discussion**

**Law Library, Paper, & Envelopes**

The County Defendants maintain the Plaintiff has no freestanding right to law library access or to trained legal assistance. Instead, inmates have a constitutional right to access to the courts. Moreover, the County Defendants maintain Plaintiff cannot prevail on his access to the courts claim because he suffered no actual injury.

Plaintiff concedes he may seek a court order granting him access to the county law library. *See e.g.,* Doc. 136-5 at 46 (detainee handbook); Doc. 149-7 at 5 (motion seeking a court order in *State of Arkansas v. Avery*, 72-CR-2016-1526-6). His testimony at the hearing, that he suffered actual injury as a result of not having access to a law library, was in contradiction to his deposition testimony that he had never had a case dismissed because he missed a deadline while he was housed at the WCDC. Doc. 115-1 at 26.

Indigent inmates are provided paper, a pencil, and two free envelopes per week. Doc. 136-1 at 3, ¶ 15. The County Defendants similarly argue that Plaintiff's claim that he is forced to chose between writing his family or the courts is without merit. They point out Plaintiff has filed a number of cases and has filed multiple documents in this and his other cases with no evidence the limitation on the provision of supplies denied him access to the courts.

The Supreme Court has held "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds v. Smith, 430 U.S. 817, 828 (1977). Nevertheless, Bounds "did not create an abstract, freestanding right to a law library or legal assistance." Lewis v. Casey, 518

-34-

U.S. 343, 351 (1996).  Instead, prison officials must provide inmates with "meaningful access

to the courts," Bounds, 430 U.S. at 824, and providing a law library is merely one way to

comply with this obligation.  See Bear v. Fayram, 650 F.3d 1120, 1123 (8th Cir. 2011) (the

constitutional requirement of access to the courts may be satisfied in a number of ways

including, prison libraries, jailhouse lawyers, private lawyers on contract with the prison, or

some combination of these and other methods).  However, an inmate has no standing to pursue

an access claim unless he can demonstrate  he suffered prejudice or actual injury as a result of

the prison officials' conduct.  See Lewis, 518 U.S. at 351-2; see also Farver v. Vilches, 155

F.3d 978, 979-980 (8th Cir.1998) (per curiam); Klinger v. Dep't of Corr., 107 F.3d 609, 617

(8th Cir.1997) (to prevail on access-to-courts claim, inmate must show actual injury or

prejudice even if denial of access to library is complete and systematic); McMaster v. Pung,

984 F.2d 948, 953 (8th Cir. 1993).  "To prove a violation of the right of meaningful access to

the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim

challenging the prisoner's sentence or conditions of confinement in a court of law, which

resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious

underlying legal claim.'"  Hartsfield v. Nichols, 511 F.3d 826, 831 (8th Cir. 2008) (citations

omitted).

 The prison must also provide inmates with "paper and pen to draft legal documents

with notarial services to authenticate them, and with stamps to mail them."  Bounds v. Smith,

430 U.S. at 824-5;  see also Myers v. Hundley, 101 F.3d 542, 544 (8th Cir.1996)(citing, Lewis

, 518 U.S. at 350-1).  The duty to provide such allowances is constrained by the inmates' right

of *meaningful* access to the courts. Bounds, 430 U.S. at 824-5.

AO72A
(Rev. 8/82)

There is no genuine issue of material fact as to whether the Plaintiff was denied access to the courts. Although he testified he was hampered in litigating various of his cases, he did not testify that he had been unable to pursue a claim or that he missed any deadlines for filing documents, or that a case had been dismissed because he was unable to comply with an order of the court. Dismissal of a claim based on its legal insufficiency is not the type of actual injury that is required. See Klinger v. Department of Corrections, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic).

Similarly, with respect to the provision of writing material and envelopes, although he testified there were times he had to wait until Sunday to obtain additional materials, Plaintiff indicated all his legal mail went out and he did not identify any document he was unable to file because of the lack of paper or envelopes. The County Defendants are entitled to summary judgment on this claim.

**Access to News Media**

The County Defendants maintain that newspapers were discontinued in the general population of the WCDC because of constant problems with damage caused by inmates hoarding newspapers, fighting over them, or using them to clog toilets or start fires. Doc. 136-1 at 3, ¶ 16. To provide access to news, the County Defendants state they provide a subscription to several satellite radio stations which are played during daytime hours and which are intermittently changed. *Id.* at 3-4, ¶ 16. According to the County Defendants, the stations provide discussions of "news topics and viewpoints." *Id.* at 4, ¶ 16. When Plaintiff complained of an inability to

-36-

hear the radio, maintenance was notified.  Doc. 136-4 at 23 (6/10/2016) & 30 (7/6/2016 maintenance has checked all speakers and they are working).

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).  "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1972).  Among other things, the "Constitution protects the rights to receive information and ideas." Kleindienst v. Mandel, 408 U.S. 753, 762 (1972).

Prison policies impinging on inmates' First Amendment rights are valid only if they are reasonably related to legitimate penological interests. Turner v. Safley, 482 U.S. 78, 89-90 (1987); Cooper v. Schriro, 189 F.3d 781, 784 (8th Cir. 1999).  "[E]ven though this court engages in a deferential review of the administrative decisions of prison authorities, the traditional deference does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains." Fortner v. Thomas, 983 F.2d 1024, 1029 (11th Cir. 1993).

In determining whether a regulation or restriction is reasonable, the court employs a balancing test considering:  (1) whether a rational connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist. See Beard v. Banks, 548 U.S. 521 (2006)(applying Turner and upholding a Pennsylvania prison policy denying newspapers, magazines and photographs to a group of "specifically dangerous and recalcitrant inmates").

-37-

It has been held that "[t]here is no basis for total restrictions on prisoners' access to the news in view of their clear First Amendment rights." United States ex rel. Manicone v. Corso, 365 F. Supp. 576, 577 (E.D. N.Y. 1973). Furthermore, a number of courts have held that prisoners have a right to receive and read newspapers. See e.g, Sizemore v. Williford, 829 F.2d 608, 610 (7th Cir. 1987) (absent restrictions based on legitimate goals of confinement, prison inmates retain First Amendment right to receive and read newspapers); Mann v. Smith, 796 F.2d 79, 82-83 (5th Cir. 1986)(county jail's policy of banning newspapers and magazines violated a pretrial detainee's First Amendment rights where the state failed to show the ban served a legitimate government objective);Wilkinson v. Skinner, 462 F.2d 670, 673 n. 5 (2nd Cir. 1972)("refusal to deliver a newspaper would ordinarily be interference with appellant's first amendment rights"); Rowland v. Jones, 452 F.2d 1005 (8th Cir. 1971)(prison authorities' denial of access to newspaper "Muhammad Speaks" constituted prior restraint in violation of First Amendment); Spellman v. Hopper, 95 F. Supp. 2d 1267 (M.D. Ala. 1999)(absolute prohibition on subscription magazines and newspapers applied to administrative segregation inmates in Alabama is not reasonably related to legitimate penological goals).

Here, the County Defendants argue the ban on newspapers and magazines is rationally related to legitimate concerns because these materials were in the past used to cause plumbing problems when inmates flushed the items down the toilets or were used to start fires. According to Plaintiff, inmates are permitted to have access to books, letters, envelopes and numerous other materials that could be used to clog the plumbing or start fires. In other words, inmates have access to items that would appear to present the same security and safety concerns.

AO72A
(Rev. 8/82)

"Courts have recognized the tenuousness of the connection between [a prohibition on magazines and newspapers] and fire prevention." Spellman, 95 F. Supp. 2d at 1273; see also Kincaid v. Rusk, 670 F.2d 737, 744 (7th Cir. 1982)("[T]he total ban on newspapers was arbitrary and unjustifiable when the two hazards allegedly caused by the possession of newspapers--fire damage and jammed plumbing--could as well be caused by the sort of reading material detainees were permitted to have."); Payne v. Whitmore, 325 F. Supp. 1191, 1193 (N.D. Cal. 1971)("Jail cells are already filled with an abundance of materials quite suitable for fire starting . . . ; yet no one suggests that cells ought to be stripped of bedding, clothing, toilet paper, writing materials, and so on"). Here, the County Defendants have submitted no supporting evidence concerning the frequency of fires or problems with clogged plumbing or the effect banning newspapers had on the frequency of these problems.

I believe there are genuine issues of material fact that preclude summary judgment in the County Defendants' favor on this claim. It is clear Plaintiff was denied access to newspapers and magazines. While the County Defendants have asserted a legitimate penological reason for denying inmates access to these materials, they allow inmates access to other materials that create the same hazards they seek to avoid by the ban. There is no explanation for this in the record.

Additionally, although Plaintiff may have had some access to the radio, there are questions as to the quality of the access and whether he even had access to state, local, national, and world news. Furthermore, there is some question as to whether the radio is considered a satisfactory alternative for newspapers and magazines. See e.g., Jacklovich v. Simmons, 392 F.3d 420, 431 (10th Cir. 2004)("Concerning the inmates' other alternative means to exercise their First Amendment rights, we agree that the ability to listen to the radio or watch television is not

-39-

an adequate substitute for reading newspapers and magazines")(citations omitted).   Genuine

issues of material fact preclude summary judgment in either the County Defendants' favor or the

Plaintiff's favor on this claim.

**Interference with Mail**

The County Defendants argue that they are allowed to consider cost in determining the

amount of free postage it will provide to inmates and may employ procedures for determining

if the mail in question constitutes legal mail.   While Plaintiff maintains there were periods of

delay when mail was sent out or delivered to inmates, and that his legal mail was wrongfully

opened outside his presence on two occasions, they contend the Plaintiff's claims fail because

he has not shown any ongoing practice of censorship or that the application of any policy resulted

in the interference.   They indicate mail is not held for more than twenty-four hours excluding

holidays and weekends.   Doc. 136-4 at 33; Doc. 136-5 at 22 & 24 (detainee communications

policy).

"Inmates have a First Amendment right of free speech to send and receive mail.   Hudson

v. Palmer, 468 U.S. 517, 547 (1984).   "The fact of confinement and the needs of the penal

institution impose limitations on constitutional rights, including those derived from the First

Amendment."   Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 125 (1977).

"Prisoners' First Amendment rights encompass the right to be free from certain

interference with mail correspondence."   Davis v. Norris, 249 F.3d 800, 801 (8th Cir. 2001).

"Interference with legal mail implicates a prison inmate's right to access to the courts and free

speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."   Davis

v. Goord, 320 F.3d 346, 351 (2d Cir. 2003).   "A prison policy that obstructs privileged inmate

-40-

mail can violate inmates' right of access to the courts." <u>Weiler v. Purkett</u>, 137 F.3d 1047, 1051 (8th Cir. 1998).

Restrictions on this First Amendment right are valid "only if [they are (1)] reasonably related to legitimate penological interests,"such as security, order, or rehabilitation and are (2) no greater than necessary to the protection of the governmental interest involved.  <u>Turner v. Safely</u>, 482 U.S. 78, 89 (1987).  In balancing the competing interests, courts afford greater protection to legal mail than non-legal mail and greater protection to outgoing mail than to incoming mail.  <u>See Thornburgh v. Abbott</u>, 490 U.S. 401, 413 (1989).

Here, Plaintiff was allowed to send and receive personal and legal mail while he was at the WCDC.  He contends there were times when his legal mail was held, mail was not delivered on Saturdays, and on two occasions certified legal mail addressed to him was opened outside his presence.

Plaintiff's  claim fails because he has not shown that his legal position was prejudiced by the alleged interference with his legal mail.  <u>See e.g., Gardner v. Howard</u>, 109 F.3d 427, 431 (8th Cir. 1997)(claim fails without evidence of improper motive or resulting interference with inmate's right to counsel or access to courts); <u>see also Walker v. Navarro County Jail</u>, 4 F.3d 410, 413 (5th Cir. 1993)(an inmate shows actual injury by establishing his position as a litigant was prejudiced due to the disputed acts).  Nor is the Court aware of any provision of the Constitution that requires the delivery of mail to inmates on six days of the week.  The County Defendants are therefore entitled to summary judgment on this claim.

**Calorically and Nutritionally Deficient Diet**

The County Defendants state that it is their policy that the food served in the facility "shall be of the highest quality and greatest variety possible within budgetary constraints." Doc. 136-1 at 3, ¶ 12; *see also* Doc. 136-5 at 4-8 (food service policy). To this end, Washington County contracts with Aramark to provide all food and commissary services at the WCDC. *Id.* at ¶ 13.

The County Defendants assert that no individual WCDC employee was personally involved in Plaintiff's diet, either by planning, preparation, or adjustment due to medical needs. They also maintain the summary judgment record establishes that Aramark provided calorically and nutritionally adequate meals to the inmates of the WCDC including the Plaintiff.

For the reasons discussed above, I find no genuine issue of material fact exists as to whether Plaintiff's diet was nutritionally or calorically inadequate. Aramark prepared the meal plan, it was certified by its dietician, Aramark employee's oversaw its preparation and portion control, and requests and grievances regarding the diet were forwarded to either Aramark or medical staff if it involved a request for a special diet of any type. The County Defendants are entitled to summary judgment on this claim.

**Profiteering, Price-gouging, and Monopoly**

The County Defendants argue no constitutional claim is stated by Plaintiff's claim that he is charged more in jail than it would cost him to purchase the commissary items in the "free world." Further, the County Defendant note that the commissary is merely a service offered and no one is required to order from the commissary. *See* Doc. 136-4 at 49 (9/5/2016).

-42-

For the reasons set forth in the discussion of this same claim against Aramark, I find the County Defendants entitled to summary judgment on the claim.

### Arkansas Deceptive Trade Practices Claim

As discussed above, the Court declines to exercise supplemental jurisdiction over this claim.  28 U.S.C. § 1367(c)(1).

### Unconstitutional Conditions of Confinement Claims

The County Defendants first argue that they were not personally involved in the conditions complained of.  Second, they argue that the conditions Plaintiff complains of did not violate his constitutional rights.  They argue that Plaintiff merely has made a habit of pointing out all things he did not like about his housing arrangements.  The County Defendants state that "[u]pon notification of any damage, such as to the heat and air systems, the shower area or any other part of the facility, maintenance is notified and steps are taken to minimize the risk of any injury until the repair is completed."  Doc. 136-1 at 3, ¶ 14.

With respect to the lack of intercoms in the cells themselves, the County Defendants point out that officers are constantly observing the cells and make hourly rounds even during the nighttime hours.  Doc. 136-5 at 33 (surveillance of detainees policy).  Further, detention officers are required to make random daily security and safety inspections during their shifts.  Doc. 136-5 at 32 (security and safety inspection policy).

With respect to the use of a communal toilet during lock-out periods, the County Defendants indicate cleaning supplies are provided at least three times a day and hot water is available.  Doc. 136-4 at 32.  They state this is no different than using a toilet at a public place. *Id.*

-43-

On August 10, 2016, Plaintiff stated he slipped while exercising because the floor was wet as a result of the shower over spray. Doc. 136-4 at 42. He indicated he injured his lower back. *Id.*

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. See Farmer v. Brennan, 511 U.S. 825, 832 (1994).

"The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities." Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996); see also Hall v. Dalton, 34 F.3d 648, 650 (8th Cir. 1994) ("[I]n this circuit, the standards applied to Eighth Amendment and Fourteenth Amendment claims have been the same"). Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities. Prison conditions claims include threats to an inmate's health and safety. Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

To state an Eighth Amendment claim, the plaintiff must allege that prison officials acted with "deliberate indifference" towards conditions at the prison that created a substantial risk of

-44-

serious harm. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise.'" <u>Whitnack v. Douglas County</u>, 16 F.3d 954, 957 (8th Cir. 1994)(quoting, <u>Wilson v. Sieter</u>, 501 U.S. 294 (1991)).

This standard involves both an objective and subjective component. The objective component requires an inmate to show that "he is incarcerated under conditions posing a substantial risk of serious harm." <u>Farmer</u>, 511 U.S. at 834 (citations omitted); <u>see also Hudson v. McMillian</u>, 503 U.S. 1, 2 (1992) (The objective component is "contextual and responsive to contemporary standards of decency.")(quotation omitted). To satisfy the subjective component, an inmate must show that prison officials had "a sufficiently culpable state of mind." <u>Farmer</u>, 511 U.S. at 834 (citations omitted); <u>see also Brown v. Nix</u>, 33 F.3d 951, 954-55 (8th Cir. 1994).

As a preliminary matter for all of these claims, Plaintiff has not stated how any of the Defendants were personally responsible for these conditions.  As outlined above, neither Sheriff Helder nor Major Denzer can be held constitutionally liable just by virtue of occupying supervisory positions.  As to the remaining County Defendants, Plaintiff does not indicate how any of them  acted with deliberate indifference to the conditions under which the Plaintiff was confined.

Moreover, I agree with Defendants that none of the alleged unconstitutional conditions of confinement identified by the Plaintiff offend contemporary standards of decency.  There are no genuine issues of material fact as to whether the Plaintiff was deprived of  reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities.

-45-

With respect to the use of a communal toilet during lock out times, Plaintiff makes no argument that he was unable to use the toilet when he needed to other than perhaps having to wait for a period of time.  He does not contend his hygiene suffered as a result or that he was exposed to, or contracted, any disease.  While he asserts that cleaning supplies were not left in the pod, he does not dispute that cleaning supplies were made available at least daily.  Certainly, there is nothing to suggest the Plaintiff was deprived of a single identifiable human need.

In connection with his claims about the over spray of the showers, the failure to have skid tape on the steps, and the alleged depression on the steps where skid tape was removed, I do not believe there are any genuine issues of fact as to whether Defendants acted with deliberate indifference towards Plaintiff's safety.  With respect the shower over spray, Plaintiff concedes maintenance attempted to solve the problem and also indicates that the Defendants began using blankets to soak up the water and keep it from being a hazard.  There is simply nothing to suggest the Defendants failed to act in the face of a risk of harm to the health or safety of the detainees at the WCDC.  See e.g., LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993)("slippery prison floors . . . do not state even an arguable claim for cruel and unusual punishments")(citation omitted).      "[E]very injury suffered by an inmate does not  necessarily translate into constitutional liability for prison officials." Osolinski v. Kane, 92 F.3d 934, 937 (9th Cir. 1996).  While I do not hold that slippery floors or failing to have skid tape on stairs can never establish a claim of constitutional dimension, I believe that under the circumstances of this case no claim of constitutional dimension is stated.  See e.g., Frost v. Agnos, 152 F.3d 1124, 1129 (9th Cir. 1998)(inmate was on crutches and fell and injured himself several times--his repeated injuries and unsafe conditions state a claim where slippery floors without protective

-46-

measures create sufficient danger).  There is simply no genuine issue of material fact as to whether Defendants failed to maintain a safe area for the detainees or that they were aware there was a substantial risk detainees would fall because of the over spray or the lack of skid tape and that a fall would cause serious harm.  See e.g., Perkins v. Grimes, 161 F.3d 1127, 110 (8th Cir. 1998)(Plaintiff must prove the officials knew of facts from which they could infer a substantial risk of serious harm existed and that the officials drew that inference).

Finally, Plaintiff has alleged no harm by the failure of the lock-down cells to contain intercoms.  The one instance he testified about a fight occurring in the cells and not being able to summon help, actually occurred when the cells were unlocked.  Plaintiff could have summoned help via the intercom in the day room but did not want to leave his cell to do so.  Nor does he dispute that detention personnel both visually observe the pods but also make physical rounds on a regular basis.  See e.g., Ingram v. Busby, 2008 WL 808905, *6 (E.D. Ark. March 10, 2008)("fact that there was no intercom system in the event of an emergency does not equate to a presently existing actual threat of immediate irreparable harm.  Rather, it is nothing more than a conclusory allegation of a potential future threat that could lead to potential future physical harm").

### Privacy/Visitation Claim

Visitation is done via a video visitation system.  Doc. 136-5 at 42 & 44 (inmate handbook); *see also* Doc. 136-5 at 26-27 (detainee visitation policy).  In Campbell v. Greeley, (W.D. Ark. Feb. 27, 2015), visitation was also done via a screen and Plaintiff alleged his visitors saw an inmate masturbating.  This Court, relying on United States v. Peoples, 250 F.3d 630, 637 (8th Cir. 2001), held that neither a visitor nor an inmate has any expectation to privacy in their

-47-

conversation.  See also Henderson v. Greeley, 2015 WL 1280312, *13 (W.D. Ark. March 20, 2015); Lichetenwalter v. Maier, 2014 WL 3749126, *6 (N.D. Ohio July 29, 2014)(no violation where video cameras maintained for visitation are positioned with a view of the toilets);  Cf. United States v. Miller, 2008 WL 11293926 (N.D. Ga. Sept. 23, 2008)("it would not be reasonable to conclude that a contact via video camera in a jail setting would be private or not be eavesdropped").  The allegations made by the Plaintiff are insufficient to support a claim of Constitutional violation.  Hunger v. Auger, 672 F.2d 668, 676 (8th Cir. 1982)("We leave the formulation of specific regulations and methods of visitation to the informed discretion of correctional officials, recognizing that 'it is not the function of the federal courts to embroil themselves unduly in matters or prison administration . . . or of prison security'")(citation omitted)).

However, that is not to say, that I condone this practice, particularly if it causes an increase in inmate violence as suggested by the Plaintiff in this case.  Nor does the Court hold that such practice can never constitute a violation of the Constitution.  Instead, the Court merely holds that on the summary judgment record in this case there is no genuine issue of material fact. The County Defendants are entitled to summary judgment.

**Detox Claim**

With respect to this claim, Plaintiff has not alleged that: he asked any of the named County Defendants for treatment or assistance of any kind when he was allegedly suffering from withdrawal symptoms; any of the named County Defendants were personally present in the housing unit when he was allegedly laying on the bare concrete floor showing obvious symptoms of withdrawal; or that any of the named County Defendants were contacted regarding Plaintiff's

-48-

physical condition during this time period.  Without some type of personal involvement, the County Defendants may not be held personally liable.

**Medical Care**

Emergency medical care is available twenty-four hours a day.  Doc. 136-1 at 1, ¶ 5; *see also* Doc. 136-5 at 9-16 (medical care policy).  Deputies are trained to respond to medical emergencies and may provide temporary lifesaving care while Emergency Medical Services (EMS) or other medical personnel are in route.  Doc. 136-1 at 2, ¶ 5  The primary medical provider is the facility medical provider or EMS.  *Id.*

Medical requests are made on a kiosk machine located in the pod.  Doc. 136-1 at 2, ¶ 6.  The requests are reviewed by medical personnel.  *Id.*  Nursing staff is responsible for following all physician orders and making outside medical appointments when directed to do so by the physician.  *Id.*  The WCDC contracts with medical care providers to ensure prompt medical care.  *Id.* at ¶ 9.  Dr. Karas and Karas Correctional Health have been the medical care providers since January of 2016.  *Id.* at ¶ 10.  Medical staff make all decisions regarding the provision of health services.  *Id.* at ¶ 11.  Non-medical staff are not authorized to make non-emergency medical decisions on behalf of any inmate.  *Id.*

There is no suggestion in the summary judgment record that any of the named County Defendants made any decisions regarding Plaintiff's medical care or treatment, interfered with prescribed treatment, or intentionally delayed treatment.  Absent some personal involvement, they cannot be held liable.

AO72A
(Rev. 8/82)

**Use of Leg Irons during Transport**

Plaintiff's claim against Deputy Brad Morgan is based on his transport on March 9, 2015, in leg irons. Plaintiff contends the leg irons were too small causing his pain and suffering.

WCDC policy requires the use of waist restraints and leg restraints while detainees are being transported outside the facility. Doc. 96-2 at 1-2, ¶ 4; Doc. 96-4 at 1. When the transport is in a vehicle with a security screen, the prisoner is to be put in the back seat. Doc. 96-2 at 2; Doc. 96-4 at 3. Plaintiff was in restraints only during the transport and was seen by medical personnel at the WCDC. There is no suggestion that Deputy Morgan deliberately brought a "small" set of leg irons to cause the Plaintiff additional pain or discomfort during transport. In fact, during his deposition, Plaintiff testified the shackles Deputy Morgan used were just like those he was in that day. Doc. 96-1-at 3.

There is no evidence that Deputy Morgan's use of restraints, in this case leg irons, caused any injury to the Plaintiff in addition to that already present. In fact, Plaintiff testified the injury had existed prior to 2015.

The restraints were used in the proper manner, for the proper purpose, and for no longer than it took to transport the Plaintiff. Plaintiff suffered no long-term or permanent injury. See Hanig v. Lee, 415 F.3d 822, 834 (8th Cir. 2005); Crumley v. City of St. Paul, 324 F.3d 1003, 1008 (8th Cir. 2003); Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1077-78, 1082(8th Cir. 1990). Deputy Morgan is entitled to summary judgment in his favor.

**Official Capacity Liability**

The County Defendants contend the Plaintiff only disagrees with the policies of the WCDC. Because their policies are facially lawful and did not compel unconstitutional action,

Plaintiff has the high burden of proving that the county's decision to maintain the policies was made with deliberate indifference to its known or obvious consequences.

"Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." <u>Bolcerson v. City of Wentzville, Missouri</u>, 840 F.3d 982, 985 (8th Cir. 2016)(citation omitted).

With the exception of the claim regarding the newspaper policy and/or the provision of news media, there is no evidence in the summary judgment record that could support a conclusion that the County Defendants are liable.   The County Defendants are entitled to summary judgment on the Plaintiff's remaining official capacity claims.

### 3.  Conclusion

For the reasons stated, I recommend as follows:

●At Plaintiff's request, the following claims should be dismissed:  (1) his claims against Nurse Landon Harris and Nurse Regina Walker; (2) his claim that he was entitled to a vegetarian diet; (3) his claim about the handling of the food by Aramark Correctional Services; (4) his claim about inadequacies in the grievance procedure; (5) his claims against Sergeant Arnold; and (6) his claims Lieutenant Reeser.

● Plaintiff's motion (Doc. 81 at 1-4) for summary judgment against Deputy Brad Morgan be **DENIED**;

● Plaintiff's motion (Doc. 81 at 5-9) for summary judgment against Patrolman Vence Motsinger be **DENIED**;

-51-

● Plaintiff's motion (Doc. 86) for summary judgment against Aramark Correctional Services and the County Defendants be **DENIED**;

● Plaintiff's motion (Docs. 84 & 92) for summary judgment against the Washington County Detention Center Defendants, Sheriff Helder, Major Randall Denzer, Sergeant Morse, Deputy Brad Morgan, Sergeant Stanton, Sergeant Ake, and Lieutenant Foster (the County Defendants) be **DENIED**;

● Deputy Brad Morgan's counter-motion (Doc. 94) for summary judgment be **GRANTED;**

● Aramark Correctional Service's motion (Docs. 112 & 151) for summary judgment be **GRANTED**;

● Dr. Karas' and Karas Medical Service's motion (Doc. 128) for summary judgment be **GRANTED**;

● the County Defendants' motion (Doc. 131) for summary judgment be **GRANTED IN PART AND DENIED IN PART.**  Specifically, it should be granted with respect to all claims except Plaintiff's claim of denial of access to the newspaper and/or news media.  On this claim, Sheriff Helder and Major Denzer should remain as Defendants and all other County Defendants should be dismissed;

● Chief Mike Peters' and Patrolman Vence Motsinger's motion (Doc. 132) for summary judgment be **GRANTED;** and

● the Court should decline to retain supplemental jurisdiction over the Arkansas Deceptive Trade Practices Act claim as the claim involves novel and complex issues of state law, 28 U.S.C. § 1367(c)(1).

-52-

The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 21st day of July 2017.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-53-