**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**ROBERT W. AVERY**                                                              **PLAINTIFF**

**V.**                                    **CASE NO. 5:16-CV-05169**

**SHERIFF HELDER, Washington County,**
**Arkansas; MAJOR RANDALL DENZER;**
**SERGEANT MORSE; SERGEANT ARNOLD;**
**ARAMARK CORRECTIONAL SERVICES, LLC;**
**CHIEF MIKE PETERS, Springdale Police Department;**
**PATROLMAN VENCE MOTSINGER;**
**DEPUTY BRAD MORGAN; NURSE LANDON HARRIS;**
**SERGEANT STANTON; KARAS MEDICAL SERVICE;**
**SERGEANT AKE; LIEUTENANT FOSTER;**
**REGINA WALKER; LIEUTENANT REESER; and**
**DR. KARAS**                                                                 **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court is the Report and Recommendation ("R&R") (Doc. 154)

of the Honorable James R. Marschewski, United States Magistrate Judge for the Western

District of Arkansas, which was filed in this case on July 21, 2017. The R&R considered

four separate Motions for Summary Judgment filed by Plaintiff Robert W. Avery (Docs. 81,

84, 86, 92); a Motion for Summary Judgment filed by Defendant Deputy Brad Morgan (Doc.

94); a Motion for Summary Judgment filed by Defendant Aramark Correctional Services,

LLC ("Aramark") (Doc. 112); a Motion for Summary Judgment filed collectively by

Defendants Dr. Karas, Karas Medical Service, Nurse Landon Harris, and Nurse Regina

Walker (Doc. 128); a Motion for Summary Judgment filed collectively by Defendants Sheriff

Helder, Major Randall Denzer, Sergeant Morse, Sergeant Arnold, Deputy Morgan,

Sergeant Stanton, Sergeant Ake, Lieutenant Foster, and Lieutenant Reeser (Doc. 131);

and a Motion for Summary Judgment filed jointly by Defendants Chief Mike Peters and

Patrolman Vence Motsinger (Doc. 132).

The R&R is 53 pages long and discusses in great detail the factual and legal bases supporting Mr. Avery's thirteen separate claims for relief. In issuing the R&R, Judge Marschewski considered the entire summary judgment record and the testimony that Mr. Avery gave during an evidentiary hearing on March 30, 2017. On August 3, 2017, Mr. Avery filed Objections (Doc. 155) to the R&R. Then, on August 9, 2017, Aramark filed a Response (Doc. 156) to Mr. Avery's objections, arguing that the objections lacked the requisite specificity to trigger *de novo* review. On August 10, 2017, Chief Mike Peters and Patrolman Vence Motsinger filed a Response (Doc. 157) to Mr. Avery's objections, also arguing that the objections were insufficiently specific to trigger *de novo* review. Chief Peters and Patrolman Motsinger also pointed out that Mr. Avery's objections raised a new issue that was not set forth in either the complaint or Amended Complaint, nor briefed on summary judgment, namely that Patrolman Motsinger displayed deliberate indifference to Mr. Avery's preexisting serious medical condition by placing him in leg irons for transport from the Springdale Police Department ("SPD") to the Washington County Detention Center ("WCDC").

Pursuant to 28 U.S.C. § 636(b)(1), the Court must give *de novo* consideration to those portions of the R&R to which objections are made. However, in order to trigger such review, the objections must address particular findings or conclusions of the magistrate judge or assert specific allegations of error. *See, e.g.*, *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) ("A district court must make a de novo determination of those portions of a magistrate's report and recommendation to which objections are made."). The Court

2

finds that, on balance, Mr. Avery's objections are specific enough to trigger *de novo* review, and in performing that review, the Court has considered the R&R, the entire record on summary judgment, and the audio recording of the nearly three-hour evidentiary hearing on March 30.

The R&R recommends that the Court take the following action:

(1) dismiss all claims against Nurse Harris, Nurse Walker, Sergeant Arnold, and Lieutenant Reeser, as per Mr. Avery's request made during the evidentiary hearing;

(2) dismiss Mr. Avery's claims concerning the refusal to provide him with a vegetarian diet, the handling of his food, and the jail's grievance procedure, as per Mr. Avery's request made during the evidentiary hearing;

(3) deny all of Mr. Avery's motions for summary judgment;

(4) grant Defendants' motions for summary judgment as to all of Mr. Avery's claims, with the exception of his claim about the WCDC's denial of inmate access to newspapers and/or news media; and

(5) decline to take supplemental jurisdiction over Mr. Avery's Arkansas Deceptive Trade Practices Act ("ADTPA") claim.

The Court has reviewed Mr. Avery's filing and discerns ten separate objections, which are summarized as follows:

(1) objection to granting summary judgment on the claim that the prisoner transport van used by the SPD created an unreasonable risk of harm;

(2) objection to granting summary judgment on the claim that Patrolman Motsinger used excessive force or displayed deliberate indifference to an established medical condition by placing Mr. Avery in leg irons during a transport from the SPD to the WCDC;

(3) objection to the Court declining to exercise supplemental jurisdiction over the ADTPA claim;

(4) objection to granting summary judgment to Aramark on Mr. Avery's claim that he was served substandard, nutritionally inadequate food at the WCDC, which resulted in his excessive weight loss;

3

(5) objection to granting summary judgment to Karas Medical Service for the alleged delay in testing Mr. Avery for Hepatitis C;

(6) objection to granting summary judgment to Washington County and various WCDC officers regarding Mr. Avery's claim about the lack of access to a law library, and the alleged failure to provide sufficient paper, envelopes, and access to the U.S. Postal Service;

(7) objection to granting summary judgment on the conditions-of-confinement claims, including the lack of skid plates on the stairs, the slippery "overspray" area in the showers, the lack of drain covers in the showers, the lack of intercoms in the inmates' cells, the single toilet for 32 inmates to share, and the policy of housing violent and non-violent inmates together;

(8) objection to granting summary judgment on the claim that the WCDC's visitation system creates an unreasonable risk of harm to inmates and violates visitors' and inmates' right to privacy;

(9) objection to granting summary judgment on the claim that Deputy Brad Morgan used excessive force or displayed deliberate indifference to an established medical condition by placing leg irons on Mr. Avery during a transport from the Arkansas Department of Correction ("ADC") to the WCDC; and

(10) objection to granting summary judgment on certain official-capacity claims.

Below, the Court will consider each of Mr. Avery's objections and explain its reasoning as to which claims are sufficiently supported to survive summary judgment. In doing so, the Court will not restate all the background facts that were set forth in the R&R, but will instead mention only those facts that are pertinent to discussing each of the objections. For the reasons set forth in this Opinion and Order, the Court will **ADOPT IN PART AND DECLINE TO ADOPT IN PART** the R&R and preserve two of Mr. Avery's claims for trial.

## I. LEGAL STANDARD

The standard of review on summary judgment is well established. Under Federal

4

Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999). Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)).

In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

5

## II. OBJECTIONS

### A. Safety of Prisoner Transport Van

The van that was used to transport Mr. Avery from the SPD to the WCDC lacked

seatbelts and safety bars. Even so, Mr. Avery testified in his deposition that he was never

involved in an accident while he was a passenger in this transport van, and he at most

suffered scratches and bruises from being jostled about in the van. In his objections, Mr.

Avery asserts that the van should have been equipped with seatbelts, as he believes the

lack of seatbelts is evidence of the City of Springdale's deliberate indifference to his (and

other inmates') health and safety.

The Court overrules Mr. Avery's objection. As the R&R explained, the Eighth Circuit

has already determined that the lack of seatbelts in a transport van does not, in and of

itself, give rise to a viable Section 1983 claim. *See Spencer v. Knapheide Truck Equip.

Co.*, 183 F.3d 902, 906 (8th Cir. 1999), *cert denied*, 528 U.S. 1157 (2000) ("[E]ven using

an objective standard, we do not think that the Board's purchase of patrol wagons without

safety restraints nor its manner of transporting individuals in these wagons were policies

that obviously presented a 'substantial risk of serious harm.'"). This claim is dismissed on

summary judgment.

### B. Motsinger's Use of Excessive Force or Display of Deliberate Indifference

Mr. Avery apparently concedes that his excessive-force claim against Patrolman

Motsinger should be dismissed, as per the R&R's recommendation. *See* Doc. 155, p. 2.

However, Mr. Avery asserts that "[t]he Court used excessive force as the legal reasoning

when in fact my Complaint was about his deliberate indifference to my injured right

6

calf/ankle area." *Id.* In other words, Mr. Avery objects to the Court dismissing his claim

altogether, using only an "excessive force" analysis, when he intended the claim to be

asserted in terms of the officer's "deliberate indifference." Patrolman Motsinger responds

that a deliberate-indifference claim was never raised in the Amended Complaint and only

appears for the first time in Mr. Avery's objections to the R&R. *See* Doc. 157, p. 3.

The Court disagrees with Patrolman Motsinger's contention that the deliberate-

indifference claim is a brand new issue that was neither raised in the Amended Complaint

nor contemplated by the parties prior to the issuance of the R&R. With respect to the

Amended Complaint, the allegations concerning Patrolman Motsinger are as follows:

Springdale P.D. Patrolman Motsinger placed leg irons that were too small upon my ankles, despite the numerous request[s] for larger leg irons. I suffer nerve damage and blood clots as well as vericose veins. Motsinger was wanto[n]ly abusive in the mistreatment of the plaintiff. The use of small leg irons by Motsinger caused undue pain and suffering as well as mental and emotional anguish.

(Doc. 27, p. 5). Interpreting Mr. Avery's *pro se* pleading liberally, as the Court is required

to do, *see Estelle v. Gamble*, 429 U.S. 97, 106 (1976), he has adequately set forth a

deliberate-indifference claim. Furthermore, Mr. Avery's Motion for Summary Judgment

against Patrolman Motsinger (Doc. 81) supports and gives additional color to that claim.

In the Motion, he reviewed his own medical history to establish that his leg condition had

been previously diagnosed by doctors; he asserted that he showed Patrolman Motsinger

his injured legs, and that the officer was well aware of those injuries prior to placing him in

leg irons; and he claimed that he warned Patrolman Motsinger that placing him in leg irons

could cause him pain and further injuries. *Id.* at 6. The Motion also charged Patrolman

Motsinger with "careless treatment of [Mr. Avery's] right leg and ankle" and with causing

7

intentional "pain, suffering and mental anguish," *id.* at 7, both of which are facts that support a deliberate-indifference claim.

According to the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), an officer shows deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety . . . ." Further, the Eighth Circuit has explained:

A claim of deliberate indifference has both an objective and a subjective component. Thus, the relevant questions here are: (1) whether [the plaintiff] had a serious medical need or whether a substantial risk to [his] health or safety existed, and (2) whether [the officer] had knowledge of such serious medical need or substantial risk to [the plaintiff's] health or safety but nevertheless disregarded it.

*Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 529 (8th Cir. 2009) (internal citation omitted).

Keeping the above legal standard in mind, it is clear from the record that the parties engaged in discovery with the understanding that Mr. Avery had, in fact, asserted a deliberate-indifference claim. Take, for instance, Mr. Avery's deposition. In it, he testified about his medical history and verified that he had been prescribed antibiotics for an open wound on his right leg as late as March of 2015. *See* Doc. 115-1, pp. 57-59. He further testified that the wound "was still pretty much a raw wound," *id.* at. 59, and that it had not yet healed as of May 23, 2016, when Patrolman Motsinger placed him in leg irons for the transport in question. Mr. Avery also testified that after he showed his wound to Patrolman Motsinger *before* the transport, the officer "didn't care," *id.* at 57, and then proceeded to tighten the leg shackle "one click" on the left, uninjured leg, but "three clicks"—which is tighter—around the right, injured leg, *id.* at 56.

It appears that Patrolman Motsinger chose to view all of these allegations

8

exclusively as an excessive-force claim, and not a deliberate-indifference claim.[1] The Magistrate Judge also treated the claim as one alleging excessive force only, presumably because Patrolman Motsinger briefed the issue that way in his affirmative Motion for Summary Judgment (Doc. 134). The narrow treatment of the claim in the R&R is somewhat surprising, though, since Mr. Avery clearly stated during the evidentiary hearing that he intended to sue Patrolman Motsinger for deliberate indifference, but *not* for excessive force.

It goes without saying that even though the deliberate-indifference claim was not briefed by Patrolman Motsinger, nor mentioned in the R&R, it is still a viable claim that merits the Court's consideration.[2] In taking up the merits of the claim, the facts must be viewed in the light most favorable to Mr. Avery. Doing so requires the Court to assume that Patrolman Motsinger did, in fact, place leg irons on Mr. Avery during the transport on May 23, 2016—a fact Patrolman Motsinger denies. *See* Patrolman Motsinger's Affidavit, Doc. 106-1, p. 2 (explaining that he "specifically did not place leg irons on Mr. Avery" that day). The parties agree that the entire trip was a distance of approximately 17 miles, which Patrolman Motsinger maintains would have taken about 20-30 minutes to drive. However, Mr. Avery contends that his legs remained shackled for over an hour before the shackles

---

[1] By contrast, Deputy Morgan, against whom similar allegations were made, assumed in his briefing on summary judgment that Mr. Avery had made *both* an excessive-force claim *and* a deliberate-indifference claim against him. *See* Doc. 95, pp. 2-7.

[2] The Court also observes that Patrolman Motsinger was certainly on notice of the deliberate-indifference claim as of the date of the evidentiary hearing, and for the next several months before the R&R was published, he had the opportunity to provide supplementary briefing to the Magistrate Judge to address the issue. He chose not to do so, in favor of arguing at this stage in the proceedings that the issue is "new," and that the Court should not even consider it. *See* Doc. 157, pp. 3-4.

were finally removed.

Patrolman Motsinger agrees that the SPD's transport policy is to place inmates in leg irons "if the inmates are being combative." *Id.* He does not state in his affidavit if he remembers whether Mr. Avery was combative that day; but the SPD jailers who assisted with Mr. Avery's transport do remember. Jailer Austin Bowen submitted an affidavit affirming that all the detainees who were placed in the transport van under Patrolman Motsinger's watch that day were cooperative, including Mr. Avery. *See* Doc. 106-2, p. 2. Jailer Jean Rodriguez also stated in her affidavit that "Mr. Avery was being cooperative on May 23, 2016 and that he and the other inmates transported to the WCDC on May 23, 2016 were placed in 'belly chains' per the standard practice." (Doc. 106-3, p. 2).

Although Patrolman Motsinger insists that Mr. Avery remained in belly chains, and not leg irons, for the duration of transport, Mr. Avery tells an entirely different story. Mr. Avery remembers showing his right leg wound to Patrolman Motsinger, and the officer deliberately rolling down the soft leather uppers of Mr. Avery's boots, placing the leg irons on Mr. Avery's ankles, and tightening the leg irons one click on the left ankle, and three clicks on the right, injured ankle. Mr. Avery contends that no one else in the transport van was placed in leg irons, and that he was singled out for this treatment. He also testified that upon arriving at the WCDC, his ankles were in such a bruised and swollen state that he required treatment on May 25, 2016, with ice packs and Naproxen, an anti-inflammatory drug. The WCDC's medical records confirm that he was prescribed this course of treatment on that date. *See* Doc. 130-1, p. 19.

Because no one disputes that Mr. Avery was being cooperative prior to the transport, and no one disputes that the SPD's policy was to place cooperative detainees

10

in belly chains and not leg irons, the material question of fact here is whether Patrolman Motsinger—of his own accord, and not pursuant to SPD policy—placed leg irons on Mr. Avery, without being required to and without any provocation, despite being shown the injury on Mr. Avery's right leg. See Doc. 155, p. 3. The Court must now consider whether triable issues of fact exist as to: (1) whether Mr. Avery's leg condition constituted a serious medical need or a substantial risk to his health, and (2) whether Patrolman Motsinger knew of such serious medical need or substantial risk, but deliberately disregarded it.

As to the first question, a serious medical need is "either obvious to the layperson or supported by medical evidence, like a physician's diagnosis." Aswegan v. Henry, 49 F.3d 461, 464 (8th Cir. 1995). There is no dispute that Mr. Avery's leg condition had been diagnosed and treated by doctors for more than a year prior to the transport in question. The record is replete with undisputed medical evidence of Mr. Avery's lower leg and foot pain associated with varicose veins as early as January 13, 2014. (Doc. 130-1, p. 34). He was diagnosed with "[c]hronic venous stasis ulceration of the right lateral lower leg" on November 27, 2015. Id. at 37. He developed a wound on his right ankle that was deemed "very slow to heal." Id. at 36. And as of December 11, 2015, the wound remained unhealed and was being treated with Silvadene cream and dressing changes. Id.

A photograph of the wound appears in the record. See Doc. 149-4. Even though the photo was taken at the WCDC on October 28, 2016, several months after the transport in question, Mr. Avery testified during the evidentiary hearing that the photo accurately reflects how the wound looked back in May of 2016, when he first showed it to Patrolman Motsinger.

11

As to the second question, the Supreme Court has held that the "unnecessary and wanton infliction of pain" shows deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation and citation omitted). Considering the legal standard the Court must adhere to when ruling on summary judgment, there remain genuine, material disputes of fact as to whether Patrolman Motsinger knew of Mr. Avery's serious medical need or condition prior to the transport, and disregarded it in favor of placing him in leg irons for the purpose of inflicting pain, without any legitimate penological reason for doing so. Mr. Avery's objection is sustained, and this claim will be preserved for trial.

## C. Supplemental Jurisdiction over ADTPA Claim

Mr. Avery objects to the R&R's recommendation that the Court decline to take supplemental jurisdiction over his ADTPA claim. This claim alleges a civil conspiracy between Washington County, Arkansas, and Aramark to manipulate food portion size in order to drive up commissary sales of food that would supplement the ordinary diet. Mr. Avery offers no reasons as to why the Court should continue to exert jurisdiction over this state-law claim, other than the fact that he believes the claim to be meritorious.

The Court overrules his objection and adopts the Magistrate Judge's analysis and conclusion that this claim involves complex and novel issues of state law, and is more appropriately heard in state court. Accordingly, the claim will be dismissed without prejudice, and Mr. Avery will have an opportunity to refile it in state court if he so chooses.

## D. Quality of Food and Weight Loss

Mr. Avery maintains a claim that the low caloric value of the food he was served at

12

the WCDC by Aramark resulted in him rapidly losing a significant amount of weight over a short period of time. He asserts that Aramark, in concert with Washington County and certain individual Defendant employees of Washington County, agreed to serve the inmates insufficient amounts of food, such that Mr. Avery suffered weight loss in the amount of approximately two pounds per week over a four-month period, for a total of about 33 pounds of weight loss. Mr. Avery's objection as to the dismissal of this claim offers no new law or facts that were not previously before the Magistrate Judge on summary judgment.

The Court has reviewed the entire record with regard to Mr. Avery's weight loss and concurs with the Magistrate Judge. Although the Constitution certainly does not condone the starvation of inmates, Mr. Avery has not submitted a triable issue of fact that he suffered an Eighth Amendment violation. He was considered obese, at 269 pounds, when he entered WCDC custody in May of 2016, and even after losing 33 pounds, he was still considered overweight. He testified that prior to his arrest, in the "free world," he routinely ate up to 4,000 calories a day. *See* Doc. 115-1, p. 18. But after his arrest, when he was forced to eat the portion-controlled food that Aramark provided, his meals totaled about 3,000 calories a day—much less than what Mr. Avery was used to eating, but still sufficient to meet the current daily recommended intake established by the Food and Nutrition Board of the National Academy of Sciences' Institute of Medicine. *See* Doc. 115-2, p. 2.

Mr. Avery maintains that he suffered hunger pains and emotional distress as a result of the diet that he was served at the WCDC. However, the fact remains that while incarcerated, Mr. Avery transformed from an unhealthy body weight, to a healthier body weight. Moreover, the nursing staff at the WCDC noted his complaints of weight loss, and

13

they indicated on his medical record that if his weight dropped below the healthy range indicated by his body mass index score, the staff would "reassess" his request to receive additional food on his trays. (Doc. 130-1, p. 10). It also is notable to the Court that Mr. Avery admits he manipulated his caloric intake at the WCDC by choosing not to eat all the food that was placed on his trays. He admitted during the evidentiary hearing that he often traded food with other inmates because he perceived he had an allergy to processed meats—a condition that he conceded was never diagnosed by a doctor. He also testified that the item he tended to trade away to others was the protein-rich meat serving. He would trade high-calorie meat for low-calorie vegetables, not because he had an established medical or religious reason to refuse to eat meat, but because he simply did not want to eat the meat. In short, the Court has difficulty sympathizing with Mr. Avery's argument that the WCDC and Aramark starved him, when he voluntarily restricted his own caloric intake. For all of these reasons and the ones stated in the R&R, this claim is dismissed with prejudice, and Mr. Avery's objection to the dismissal is overruled.

## E. Delay in Providing Results of Hepatitis C Test

When Mr. Avery was incarcerated at the WCDC, he was involved in a physical altercation with an inmate. The inmate spat blood and saliva into Mr. Avery's eyes, and Mr. Avery later learned that the inmate had tested positive for Hepatitis C. Mr. Avery then became concerned that he might have contracted Hepatitis C from the inmate. It appears that shortly after the incident, Dr. Karas ordered him to undergo a Hepatitis C screening, but then at some point, his chart was amended to reflect that the screening would be performed three to six months later. After about three months, Mr. Avery was transferred to ADC custody, never having been told whether he had contracted Hepatitis C. He had

14

not—but he claims that he suffered mental and emotional trauma due to the long period of uncertainty.

"To prevail on a claim that a delay in medical care constituted cruel and unusual punishment, an inmate must show both that: (a) the deprivation alleged was objectively serious; and (b) the prison official was deliberately indifferent to the inmate's health or safety." Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005). And in order to find that the deprivation alleged was objectively serious, the Court must first consider what, if any, effect the delay in treatment had upon the inmate's health. Id. As the situation in the case at bar did not involve treatment for a medical condition, but only a screening for a disease, and since Mr. Avery provided no proof in the form of medical evidence to establish that he suffered any detrimental health effect from the delay—as is required, see id. (quoting Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997))—his objection is overruled, and the claim is dismissed with prejudice.

### F. Lack of Access to Law Library and Issues Regarding Mail

Mr. Avery's sixth objection concerns the lack of a law library at the WCDC. This claim lacks merit and will be dismissed, as per the Magistrate Judge's recommendation. Mr. Avery argues that the multiple civil lawsuits he was pursuing while incarcerated at the WCDC might have been resolved in his favor, if only he had access to an on-site law library. However, as the R&R explained, the WCDC is not required under law to have a law library. Instead, prison officials are simply required to provide inmates with meaningful access to the courts, which may be accomplished in a variety of ways. For example, the WCDC is agreeable to transporting an inmate to the county law library if he is first granted

15

permission by a court. Mr. Avery stipulates that he never requested a court's permission to use the county law library.

To prevail on this claim, Mr. Avery would need to show that he suffered either prejudice or actual injury as a result of the WCDC's policy. "To prove actual injury, [a prisoner] must 'demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded.'" *White v. Kautzky*, 494 F.3d 677, 680 (8th Cir. 2007) (quoting *Lewis v. Casey*, 518 U.S. 343, 353 (1996)). Here, Mr. Avery fails to establish facts that show that the lack of an on-site law library was the cause of the dismissal of otherwise nonfrivolous legal claims.[3]

With respect to Mr. Avery's claims regarding the amount of paper and envelopes he was provided free of charge by the WCDC, and the allegation that certain WCDC Defendants interfered with his mail, the Court has reviewed his objection and finds that it asserts no new law or facts. The Court agrees with the Magistrate Judge that Mr. Avery has failed to create a genuine, material issue of fact concerning prejudice he might have suffered in bringing any of his legal claims due to alleged interference with the mail by the prison guards, or due to a lack of paper or envelopes. For these reasons, the objection is overruled.

---

[3] For example, one of the supposedly nonfrivolous lawsuits he cites in support of his argument is *Avery v. Hyslip, et al.*, Case Number 5:16-CV-5283. The undersigned presided over that case. Those claims were dismissed pursuant to an initial screening of the complaint under the Prison Litigation Reform Act, 28 U.S.C. § 1915. The case was entirely frivolous, as it consisted of allegations that the state public defenders had inadequately represented Mr. Avery. Such claims are not cognizable under 42 U.S.C. § 1983. *See* 5:16-CV-5283, Doc. 8, p. 3 (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981)). Other examples from cases cited by Mr. Avery in his objection are similarly unpersuasive.

16

## G. Conditions at the WCDC

The next objection is lengthy because it restates many of the same factual contentions Mr. Avery raised in the summary judgment briefing and during the evidentiary hearing concerning the conditions of his confinement at the WCDC. He mentions, for example, the lack of skid plates on the stairs, the slippery "overspray" area near the pod showers, the absence of drain covers in the shower area, the lack of intercoms in the inmates' cells, the single toilet that multiple inmates must share in the pod area, and the jail's practice of housing non-violent offenders with violent offenders.

The Court agrees with the R&R's finding that none of the above claims offend contemporary standards of decency so as to create a constitutional right to relief. Mr. Avery has not created a genuine, material question of fact that WCDC officials responded inadequately to his grievances and/or showed deliberate indifference to concerns for health and safety. It is true that the Eighth Amendment imposes upon jailers the responsibility to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527(1984)). However, the particular claims asserted by Mr. Avery, even if assumed true, would not be sufficient to create a triable question of fact for a fact-finder to resolve. Accordingly, his objection is overruled.

## H. Visitation Screens and Risk of Harm to Inmates

Mr. Avery also claims that the video-screen visitation system used at the WCDC violates inmates' constitutional rights. He filed an objection to the dismissal of this claim, arguing that visitors and inmates are subjected to various indecencies through the video

17

visitation system, including being forced to view other inmates in the pod performing sexual acts. He also claims that inmates' conversations with visitors are capable of being overheard by other inmates, and on one occasion he was attacked by an inmate who had overheard something derogatory Mr. Avery had said about him during visitation.

The Magistrate Judge is correct that neither visitors nor inmates have any expectation of privacy in their conversations, and the way in which prisons and jails choose to conduct visitation sessions is an administrative matter not generally within the Court's oversight. This claim, even viewed in the light most favorable to Mr. Avery, fails to rise to the level of a constitutional violation, and his objection is overruled.

## I. Morgan's Use of Excessive Force or Display of Deliberate Indifference

Mr. Avery claims that he suffered pain and discomfort at Deputy Morgan's hands when the officer placed him in leg irons on March 9, 2015, for an approximately four-hour transport from an ADC facility to the WCDC. The transport vehicle was a car, not a van, and it was equipped with a security screen separating the front seat from the back seat. Mr. Avery complains that Deputy Morgan knew about Mr. Avery's foot and ankle problems, *cf.* Section II.B., *supra*, but still placed him in leg irons for the duration of the trip. According to Mr. Avery, Deputy Morgan first assured him that he would not need to wear the leg irons, but later, when the two arrived at the transport vehicle, Deputy Morgan changed his mind and applied the leg irons, allegedly with deliberate indifference to Mr. Avery's preexisting foot and leg condition.

It appears Mr. Avery does not contest the fact that the WCDC's transport policy required the use of both waist and leg restraints during the transport in question. *See* Doc.

18

96-4, p. 1 ("Detainee(s) transported outside the detention center will have a minimum of waist restraints and leg restraints . . . ."). Unlike the situation involving Patrolman Motsinger's use of leg irons, there is no question here that Deputy Morgan was required to place leg irons on Mr. Avery because of established WCDC policy. Mr. Avery does not contend that he suffered any long-term damage to his legs as a direct result of the transport.

Under the circumstances outlined above, the Court finds that Deputy Morgan's actions did not violate Mr. Avery's Eighth Amendment rights. But even if they did, and a constitutional violation were clearly established, Deputy Morgan would be entitled to qualified immunity because he would have reasonably believed that placing Mr. Avery in leg irons was required to comply with the WCDC transport policy. Mr. Avery's objection to the dismissal of this claim is overruled.

## J. Official-Capacity Claims

Mr. Avery's last objection concerns official-capacity claims related to: (1) the policies adopted by Aramark and WCDC that allegedly evidence collusion and price-gouging behavior in violation of the ADTPA, (2) the policy of the WCDC regarding the lack of an on-site law library, (3) and the policy of the WCDC regarding the distribution of a set amount of paper and envelopes per week to each inmate.

With respect to the first policy noted in Mr. Avery's objection, the Court declined to exert supplemental jurisdiction over the ADTPA cause of action, which relates to this policy. As to the second policy in the objection, the Court already determined that Mr. Avery failed to establish that the lack of an on-site law library violated his constitutional rights. With regard to the third policy, the Court similarly found that Mr. Avery failed to

19

establish that his constitutional rights were violated due to the WCDC's rules regarding paper, envelopes, and access to the U.S. Postal Service. The objection is therefore overruled.

## III. CONCLUSION

For the reasons discussed herein, the Court **ADOPTS IN PART AND DECLINES TO ADOPT IN PART** the R&R (Doc. 154). The R&R is not adopted as to the recommendation that the claim against Patrolman Vence Motsinger be dismissed. All other recommendations are adopted.

**IT IS THEREFORE ORDERED** that:

- Plaintiff Robert W. Avery's Motions for Summary Judgment (Docs. 81, 84, 86, 92) are **DENIED**;

- Defendant Deputy Brad Morgan's Motion for Summary Judgment (Doc. 94) is **GRANTED**;

- Defendant Aramark Correctional Services, LLC's Motion for Summary Judgment (Doc. 112) is **GRANTED**;

- Defendants Dr. Karas's, Karas Medical Service's, Nurse Landon Harris's, and Nurse Regina Walker's Motion for Summary Judgment (Doc. 128) is **GRANTED**;

- Defendants Sheriff Helder's, Major Randall Denzer's, Sergeant Morse's, Sergeant Arnold's, Deputy Morgan's, Sergeant Stanton's, Sergeant Ake's, Lieutenant Foster's, and Lieutenant Reeser's Motion for Summary Judgment

20

(Doc. 131) is **GRANTED IN PART AND DENIED IN PART**, in that the Motion is granted as to all claims asserted against them, with the exception of the claim for denial of access to newspapers and/or news media against Sheriff Helder in his official capacity, and Major Denzer in his official capacity;

- Defendants Chief Mike Peters' and Patrolman Vence Motsinger's Motion for Summary Judgment (Doc. 132) is **GRANTED IN PART AND DENIED IN PART**, in that the Motion is granted as to all claims against them, with the exception of the individual claim for deliberate indifference against Patrolman Motsinger for an incident that occurred on May 23, 2016, involving leg irons;

- All claims against Nurse Harris, Nurse Walker, Sergeant Arnold, and Lieutenant Reeser, are **DISMISSED WITH PREJUDICE** on summary judgment, as per Mr. Avery's request made during the March 30, 2017 hearing;

- Mr. Avery's claims concerning the refusal to provide him with a vegetarian diet, the handling of his food at the Washington County Detention Center, and complaints about the jail's grievance procedure are **DISMISSED WITH PREJUDICE** on summary judgment, as per Mr. Avery's request made during the March 30, 2017 hearing; and

- The Court declines to exert supplemental jurisdiction over Mr. Avery's Arkansas Deceptive Trade Practices Act claim, and that claim is **DISMISSED WITHOUT PREJUDICE**.

The effect of this Order is that the following claims are preserved for trial:

21

(1) the individual-capacity claim for deliberate indifference against Patrolman Motsinger for an incident that occurred on May 23, 2016, involving leg irons; and

(2) the official-capacity claims against Sheriff Helder and Major Denzer, which are tantamount to claims against Defendant Washington County, Arkansas, related to the policy of the Washington County Detention Center concerning inmate access to newspapers and/or news media.

**IT IS SO ORDERED** on this 2nd day of September, 2017.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE